**WEIRTON ICE AND COAL SUPPLY CO., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 7121.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 5, 1956.

Decided March 19, 1956.

Joseph W. Kiernan, Washington, D. C. (Robert P. Smith, D. A. Baker, and Smith, Ristig & Smith, Washington, D. C., on brief), for petitioner.

Marvin W. Weinstein, Atty., Dept. of Justice (H. Brian Holland, Asst. Atty. Gen., Robert N. Anderson and I. Henry Kutz, Attys., Dept. of Justice, on brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

The question involved in this petition to review is whether the Weirton Ice and Coal Supply Company, in computing its income taxes for the years 1946 to 1949, was entitled to take a percentage depletion deduction from its gross income from strip mining operations which it conducted under a contract with the National Steel Corporation.

Under provisions of the Internal Revenue Code and Treasury Regulations,[1] a reasonable allowance for depletion and for depreciation of improvements in the case of mines is allowed as a deduction in computing the net income of the owner of an economic interest in the mineral in place. An economic interest is possessed when the taxpayer has acquired by investment any interest in mineral in place and secures by any form of legal relationship income derived from the severance and sale of the mineral to which he must look for a return of his capital; but a person who has no capital investment in the mineral deposit does not possess an economic interest merely because through a contractual relation to the owner he possesses a mere economic advantage derived from production.

Weirton began the strip mining of coal on its own land in 1937 and in 1939 it began to sell its product to a subsidiary of the National Steel Corporation. In 1940 officials of National, being apprehensive that the price of coal set by government regulations during

---

1. Internal Revenue Code of 1939.

"§ 23. Deductions from gross income. * * *

* * * * *

"(m) Depletion. In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; * * *."

26 U.S.C. 1952 ed. § 23.

"§ 114. Basis for depreciation and depletion.

* * * * *

"(b) Basis for depletion

* * * * *

"(4) [As amended by Sec. 145, Revenue Act of 1942, c. 619, 56 Stat. 798, and Sec. 124, Revenue Act of 1943, c. 63, 58 Stat. 21.] Percentage depletion for coal * * *

"(A) In general. The allowance for depletion under section 23(m) shall be, in the case of coal mines, 5 per centum, * * * of the gross income from property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, * * *.

"(B) Definition of gross income from the property. As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining', as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term 'ordinary treatment processes', as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; * * *."

26 U.S.C. 1952 ed. § 114.

Treasury Regulations III, promulgated under the Internal Revenue Code of 1939.

Sec. 29.23(m)—1. Depletion of Mines, Oil and Gas Wells, Other Natural Deposits, and Timber; Depreciation of Improvements.

Section 23(m) provides that there shall be allowed as a deduction in computing net income in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements. Section 114 prescribes the bases upon which depreciation and depletion are to be allowed.

the emergency of war would be high, approached Weirton with the idea of making a captive mine of two tracts of land owned by Weirton in Washington County, Pennsylvania. In consequence an arrangement was made under which the two tracts were transferred by Weirton to National at cost on February 20, 1941 and on the same day the parties entered into an agreement for the strip mining of the coal therefrom by Weirton for the use of National.

The agreement recited that National owned the two tracts of land under the conveyance which Weirton had made and expected to acquire other adjoining tracts. It was provided that Weirton would mine, clean and deliver the coal to National in such quantities and sizes as National from time to time might direct, at the price of $1.10 per ton subject to adjustment, however, for increase or decrease of Weirton's labor costs. Weirton agreed at its own expense to construct and maintain the necessary roads and ways and to furnish the necessary equipment, machinery, labor supplies and power. National agreed to furnish rough slag for the roads and to pay the taxes and other government charges and assessments on the lands and coal removed therefrom. For the protection of National Weirton agreed to maintain workmen's compensation and public liability insurance. The agreement was to remain in full force until either party should elect to terminate it upon 90 days written notice.

Subsequently and in accordance with the expectation expressed in the agreement, Weirton transferred to National additional coal lands which included two tracts of land on March 31, 1941, one tract on August 18, 1941, two tracts on December 31, 1941 and finally a 140 acre tract on January 15, 1942. These lands were also located in Washington County, Pennsylvania, and amounted in the aggregate to 1,000 acres of coal lands suitable for strip mining. All of the lands were transferred by Weirton to National at cost; and it was contemplated that the mining of coal in such lands would be performed by Weirton under the agreement.

Weirton began to supply National with coal from the lands under the agreement in 1941 and during the tax years 1946 to 1949 supplied all the steam coal used by National at its plant at Weirton, West Virginia. Prices paid by National ranged from $1.15 per ton in 1941 to $2.29¾ in 1946 and $2.76¾ in 1949. During the tax years Weirton also mined coal from its own lands and sold it on the open market.

In order to fulfill its obligations under the above agreement Weirton built macadam roads on the lands conveyed at a cost of approximately $30,000. The roads were extended gradually as the extraction of coal caused the mining to be conducted further from the tipple. Weirton furnished all equipment, machinery, trucks, tools, fuel, supplies, labor, and power necessary to mine, clean, and deliver the coal to National. It maintained adequate workmen's compensation and public liability insurance. It employed on the average of 68 or 69 men in the operation. It paid a fixed sum of between five and forty cents per ton of coal mined to the United Mine Workers Welfare and Retirement Fund on behalf of its miners. It provided the tipple. The entire operation was conducted by Weirton without any advice or direction from National. During the taxable years involved Weirton was never advised to cut down on the amount of coal being produced.

On December 14, 1949, National entered into an indenture with Weirton dated May 31, 1945, whereby National conveyed all of the above lands back to Weirton, but reserved to itself the oil, gas and coal rights. In consideration for the above conveyance Weirton promised to secure the discharge of National from its agreements that it had filed or would file with regard to restoring and reforesting or replanting the lands pur-

suant to Pennsylvania statutes, 52 P.S. § 1396.1 et seq. covering open pit mining operations.

During each of the taxable years involved, the number of tons of coal mined, cleaned, and delivered by Weirton to National under the contract, the gross amounts received from National therefor, the amounts allocable to the delivery of the coal from the tipple, and the cost of the equipment used in the strip mining operation were as follows:

| Year | Tons Delivered | Gross Receipts | Delivery Charges | Cost of Equipment |
|------|----------------|----------------|------------------|-------------------|
| 1946 | 240,804.20 | $526,046.67 | $ 70,777.93 | $290,029.10 |
| 1947 | 315,403.25 | 761,181.64 | 96,412.04 | 519,214.10 |
| 1948 | 364,953.80 | 985,540.96 | 144,249.74 | 560,843.50 |
| 1949 | 265,847.20 | 726,561.00 | 130,811.83 | 579,343.50 |

In each of the taxable years 50 per cent of Weirton's net income from the operation exceeded 5 per cent of the gross receipts less delivery charges.

While the Tax Court made no explicit finding on the point it was proved by the uncontradicted testimony of the secretary and treasurer of Weirton that the purpose of the contract of reconveyance of May 31, 1945, above referred to, was to carry out an understanding between National and Weirton that when Weirton had completed the extraction of the coal from the lands National was to return them to Weirton.

Under these facts the Tax Court held that Weirton did not have an economic interest in the coal in place but merely an economic advantage derived from the production of the coal under its contract with National. This conclusion was based on the theory that Weirton was merely employed by National to produce and clean the coal belonging to National at a definite price adjusted to reflect changes in labor cost. Hence it is said that Weirton was not paid for the coal but for its service in extracting, cleaning and delivering the product.

The Tax Court emphasized the provisions of the contract which gave National the right to direct from time to time the quantity of coal to be mined and the right to terminate the contract at any time on ninety days' notice.

From these provisions the court drew the conclusion that Weirton did not have the right to mine all the coal and therefore did not acquire any interest or investment whose value was reduced as the coal was extracted. The court stated that the facts of the case were virtually on all fours with those disclosed in its decision in Mammoth Coal Co., 22 T.C. 571, then on appeal to the Third Circuit, 229 F.2d 535, and found as an ultimate fact on the reasoning of that decision that Weirton had no economic interest in the coal in the lands of National. The Commissioner on this appeal adopts this argument and asserts that Weirton was merely the hireling of National subject at all times to the control of National in the production of the coal and therefore was not possessed of an economic interest in the mineral deposit.

■■ We disagree. It is well established that the purpose of the depletion allowance provisions of the statute was to encourage the exploration of natural resources which are exhausted upon recovery, and as was held in Palmer v. Bender, 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489, the right to the allowance does not depend upon the retention of ownership or any particular form of legal interest in the mineral content of the land. The court said, 287 U.S. at page 556, 53 S.Ct. at page 226: "It will be observed that the statute directs that reasonable allowance for depletion be made as a deduction in computing net taxable income * * * 'according to the peculiar conditions in each case.' * * * The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in

the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital."

In a number of recent cases these principles have been applied where the strip mining of coal was done under contracts between lessees of coal lands and independent contractors who undertook to extract the mineral. In Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 212 F.2d 52, we sustained the right to depletion of a strip miner who operated the mine under an agreement with a lessee of the land under which the lessee furnished the machinery and equipment and the strip miner provided the material, labor, tools and truck for transportation and delivery of the coal, and mined the coal and agreed to backfill the land. The strip miner was paid a stipulated price per ton out of the proceeds of the sale of the coal by the lessee and either party had the right of cancellation on thirty days' notice. We held that the strip owners possessed an economic interest in the mineral under the authority of the decision of the Supreme Court in Burton-Sutton Oil Co. v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062.

■ We have referred to the decision of the Tax Court in the Mammoth Coal case on which it relied for its decision in the instant suit. On November 30, 1955 the decision of the Tax Court in the Mammoth Coal case was reversed by the Third Circuit, 229 F.2d 535. The Court of Appeals sustained the right of a strip miner to a percentage depletion deduction from income earned under a contract with the owner of the land whereby the shipper acquired an exclusive indefinite right to strip mine the coal in place and deliver it to the owner at a specified price per ton. The stripper provided the necessary buildings, equipment and machinery for the stripping operations. The court relied on the holding in Burton-Sutton Oil Company v. Commissioner, supra, where it was said, 328 U.S. at pages 34–35, 66 S.Ct. at page 867: "Depletion depends only upon production. It is the lessor's, lessee's or transferee's 'possibility of profit' from the use of his rights over production, 'dependent solely upon the extraction and sale of the oil,' which marks an economic interest in the oil."

As noted above the Tax Court said in its opinion in the pending case that the facts of the Mammoth Coal case were on all fours with those in the case at bar. On this appeal the Commissioner recedes from this position and seeks to draw the distinction that in the Mammoth case the stripper was expressly given the right to mine all the coal in this land, whereas in the pending case the written contract is silent on this point. We are of opinion that the Tax Court's comparison was substantially correct. While the exclusive privilege of mining the coal was not explicitly set out in the National-Weirton contract, it was within the contemplation of the parties as an important part of the understanding between them, and it was actually given full effect. The purpose of National to secure a supply of coal for its steel plant was carried out by the acquisition of title to the several tracts of land at cost, and by the execution of the agreement with Weirton for the extraction of the mineral at a reasonable price. The purpose of Weirton to find a profitable market for the coal in place on the lands which it owned was likewise served, and hence it was willing to transfer the lands to National at cost and to look for the return of its investment in the land and in the operating equipment from the profits of the mining operation and from the reconveyance of the lands after the extraction of the mineral.

No stronger proof that Weirton had in effect the right to mine the coal could be found than in its willingness to invest $500,000 in the enterprise. It is of no moment that the owner of the mineral, as in other cases in which the right of an extractor to a deduction for depletion has been upheld, had the option to terminate the arrangement at any time, for as the event proved, Weirton actually mined the coal during all of the taxable years. We think that Weirton's

rights were dependent solely upon the extraction and delivery of the coal, and that the relationship of the parties to the ore in place gave it an economic interest in the mineral and entitled it to share with National the depletion allowance provided by the statute.

This conclusion is not in conflict with the recent decision of the Ninth Circuit in Usibelli v. Commissioner, 9 Cir., 229 F.2d 539, where a deduction for depletion was denied to a strip miner who held a one year contract to mine coal for the United States Army in Alaska. The court, distinguishing the case from our decision in Commissioner of Internal Revenue v. Gregory Run Coal Co., supra, pointed out that the contract before it called for the production of a definite amount of coal, which would not exhaust the deposit, and that the taxpayer did not depend for its profit upon the severance and sale of the coal but upon the agreement of the United States to pay a certain sum for services rendered.

The order of the Tax Court is reversed and the case is remanded for further proceedings.

Reversed and remanded.