George HUSS

v.

Francis R. SMITH, Collector of Internal Revenue, First District of Pennsylvania.

Russell HUSS

v.

Francis R. SMITH, Collector of Internal Revenue, First District of Pennsylvania.

Wesley HUSS

v.

Francis R. SMITH, Collector of Internal Revenue, First District of Pennsylvania.

Civ. A. Nos. 14775–14777.

United States District Court
E. D. Pennsylvania.
March 26, 1957.

Leon H. Kline, Philadelphia, Pa., for plaintiffs.

W. Wilson White, U. S. Atty., Alan J. Swotes, Asst. U. S. Atty., Philadelphia, Pa., Jerome Fink, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

VAN DUSEN, District Judge.

The trial judge makes the following findings of fact and conclusions of law:

## I. Findings of Fact

1. Plaintiffs, George Huss, Wesley Huss and Russell Huss, during the years 1944 to 1947, were members of a partnership engaged in the business of mining

coal by the strip mining method, with a principal place of business at Ringtown, Schuylkill County, Pa.

2. Pursuant to written agreements with the Philadelphia and Reading Coal & Iron Co. (hereinafter called "Reading"), denominated P-22, P-22B, P-29, P-32 and P-35, dated, respectively, May 27, 1944, February 23, 1945, May 8, 1945, December 17, 1945, and July 19, 1946 (plaintiffs' Exhibit 1 and Stipulation Exhibits A, B, D, & E), the plaintiffs, in the tax years 1944 to 1947, inclusive, strip mined coal on land owned by Reading in the Good Springs area known as the Tower City Tract, located in Schuylkill County, Pa.

3. Plaintiffs also entered into another strip mining contract with Reading, P-30, dated July 16, 1945, in the Minersville area, about 10 or 12 miles from the Tower City area (Exhibit C; N.T. 86, 87).

4. Further, plaintiffs had periodic oral strip mining arrangements with the Stevens Company (hereinafter called "Stevens") for about four or five different tracts during the years 1944 to 1947, inclusive).[1]

5. During these same years, plaintiffs also strip mined for the Jones Coal Company, Jack Jones, and the Peters Creek Coal Company.

6. Defendant Francis R. Smith was Collector of Internal Revenue for the First District of Pennsylvania from May 1, 1945, to November 11, 1952 (Stip. par. 1). All the federal income taxes paid by plaintiffs for the tax years 1945 to 1947, inclusive, were paid to the above-stated defendant.

Plaintiffs paid most of their federal income taxes for 1944 to the predecessor in office of the defendant Collector, but in 1946 plaintiffs each paid defendant Collector $987.56 as an additional payment on their 1944 income taxes. Plaintiffs' total payments of income taxes for the year 1944 are in amounts as large as the amounts they seek to recover (Stip. par. 4).

7. The partnership of which plaintiffs are members duly filed its income tax returns for the years 1944, 1945, 1946, and 1947, but in each of said returns of its income it failed to take credit for depletion in connection with the mining contracts aforesaid, and stated the distribution to the individual partners accordingly, with the result that the distributive income of each partner was, by said return, shown to be higher for income tax purposes than it would have been had the statutory percentage depletion been deducted in such statement and return.

8. Plaintiffs, in the years 1948 to 1950, inclusive, each filed claims for refund for the taxable periods of 1944 to 1947, inclusive. On these claims, the defendant Collector of Internal Revenue allowed plaintiffs percentage depletion only as to the Jones Coal Company, Jack Jones and the Peters Creek Coal Company, making refunds of a portion of the amounts claimed for those years. To the extent that the claims for refund were not allowed, plaintiffs were denied percentage depletion with respect to the Reading and Stevens contracts mentioned in paragraphs 2, 3, and 4 above. Statutory notices of such disallowance were sent to each of plaintiffs by registered mail on May 10, 1951 (N.T. 104 and Stip. par. 3).

9. Plaintiff George Huss claimed refunds of $9,861.54 for 1944, $7,189.38

---

1. These contracts on the basis of which plaintiffs claim percentage depletion deductions are those with Western Anthracite and not with Stevens Company. Part of the arrangement included that the coal be sold to Stevens, but the coal could have been sold to another coal company. The prospecting and uncovering of the coal was done by plaintiffs under contracts between Western and plaintiffs. Only when the coal was uncovered did plaintiffs enter into separate agreements with Stevens for the sale of such coal. But since counsel have referred to these coal contracts as the "Stevens" contracts, the court in this opinion will similarly do so, though recognizing that the initial agreements with Western Anthracite are the agreements upon which plaintiffs' claims for percentage depletion are based.

for 1945, $5,728.46 for 1946, and $5,107.20 for 1947.

Plaintiff Russell Huss claimed refunds of $9,861.54 for 1944, $7,270.10 for 1945, $5,720.04 for 1946, and $5,089.91 for 1947.

Plaintiff Wesley Huss claimed refunds of $9,861.54 for 1944, $7,270.10 for 1945, $5,734.30 for 1946, and $5,146.92 for 1947.

The claims for refund of each plaintiff were allowed to the extent of $4,799.65, plus interest, for the year 1944; $1,847.57, plus interest, for the year 1945; and $646.54, plus interest, for the year 1947 (Stip. pars. 2 & 3).

10. Prior to signing the contract of May 27, 1944, (P–22) between plaintiffs and Reading, plaintiffs went onto the land, looked over the ground, and moved in equipment so as to test for the presence of sufficient coal to start the operation.

11. Before the five Tower City stripping contracts (see Finding No. 2) were let, Reading furnished plaintiffs with surface maps showing where the veins of coal were or where they were supposed to be. All of the tracts had been deepmined and the tract covered by P–22B had been partially strip mined, but plaintiffs were the first to strip mine on the other four areas involved in the Reading contracts.

12. After P–22 was negotiated, plaintiffs never investigated by test boring or prospecting for coal before signing the other contracts. Plaintiffs could see where the land had been previously mined and the thickness of the exposed veins of coal. When the contracts after P–22 were offered to plaintiffs, they were well acquainted with the tracts being offered and were able to discuss prices for delivery of the coal to the colliery. Except for changes in price due to increased labor costs, plaintiffs entered into all the contracts after P–22 without detailed negotiations of their terms.

13. Plaintiffs' job, in both the Reading and the Stevens contracts, consisted of removing the loose overburden from the top, drilling and shooting the rock overburden, removing this overburden by dragline, cleaning the coal, loading the coal on trucks, and delivering it to the Westwood colliery operated by Stevens. When the coal was delivered to the colliery, it was weighed in and, at the end of each day, plaintiffs got a sheet with the number of loads and the weight of the coal they had delivered.

14. Reading had the right to send inspectors on the property to direct plaintiffs as to the average amount of overburden to be removed in ratio to the coal, and they occasionally exercised that right. The inspector also checked the coal to see whether it was acceptable or not before it was loaded in trucks.

15. The coal from the Forestville area was delivered to the same colliery by railroad cars on the Reading Railroad. Plaintiffs' contract, P–30, called for loading the coal at a siding in Forestville, and, pursuant to a working agreement between Reading and Stevens, one of the latter two paid the freight from the loading point to the colliery.

16. In all of the Reading contracts, plaintiffs were paid a stated price per ton of coal delivered to the colliery (N.T. 33, 35, Article 37 of P–22).[2]

17. As to both the Reading and Stevens contracts, plaintiffs themselves determined when and where to begin and to stop the mining in a particular area. They also determined whether or not it would be profitable to begin strip mining. If plaintiffs had determined that it would not have been economically possible, they

2. Article 37 of all six Reading contracts provided that the price per gross ton was "full compensation for the full performance of all work and for the furnishing of all material, labor, power, tools, machinery, implements and equipment required for the work * * *; also, for all loss or expense incurred for delays caused by damage to the work or materials or otherwise; also for all loss, damage or expense arising in the progress of the work from unforeseen obstructions or difficulties or other risks connected therewith. * * *"

were not entitled to be reimbursed for their prospecting costs.

18. Plaintiffs paid the men who did the work in this operation and also paid for all of the equipment, supplies and materials.

19. In order to get the equipment to the first job site, plaintiffs spent $10,000 to $15,000 for building roads and moving. This figure, though, includes plaintiffs' labor and supply costs —i. e., the cost of their own employees. One shovel was moved 1½ miles and the other 3½ miles to this first Tower City tract. Both were moved by walking them on their own power. The other Tower City stripping areas were contiguous areas, adjacent to one another, and, except for some equipment purchased to put on those tracts, plaintiffs moved equipment from one tract to another. No equipment was permanently affixed to any of the tracts so as not to be feasibly removed. But none of the equipment could very well be used for purposes other than coal stripping except the bulldozers and trucks.

20. After the stripping of the Forestville tract, the equipment used there was moved to Tower City and, at the end of 1947, plaintiffs' equipment was either moved onto other properties or sold.

21. The equipment initially taken in for the first Tower City contract job in 1944, and not acquired solely for that contract, included two draglines (one 2½-yard and one 3½-yard dragline), bulldozers, drills, air compressors, a number of trucks, and about 15 large trucks and coal haulage trucks, the value of all of which was "around $100,000." Other materials used in carrying out the strip mining contracts were all sorts of parts and supplies, cables, fuel oil, motor oil, greases, gasolines, electricity, and parts for machinery. Also, plaintiffs had to construct buildings, shops and supply houses.[3] During the operations on the Tower City contracts, one 2-yard dragline was shifted to another operation. By the end of 1947, plaintiffs had "around $500,000. worth of equipment" on the job. But this same equipment had been used on other coal stripping contracts not with Reading, with the exception of the 3½-yard machine.

22. All of the equipment and supplies used in the contracts with Reading and Stevens were paid for by plaintiffs, but plaintiffs took deductions on their tax returns for all those items—i. e., the labor force and the equipment—as ordinary and necessary expenses of doing business. Also, plaintiffs got depreciation on the described equipment.

23. About three weeks after entering onto P-22, plaintiffs were producing a small amount of tonnage, but it was at least two months before they got tonnage that would compensate them and give them a small profit. "Some coal" was produced off P-29 shortly after that contract was signed.

24. The Reading contracts required plaintiffs to strip mine coal as long as no more than a specified ratio of cubic yards of overburden per gross ton of raw coal recovered was present (N.T. 137–8, Article 2 of P-22). When the ratio, usually four or six cubic yards of overburden to one ton of coal, ran higher than that specified in the contracts, it would usually be unprofitable to strip mine coal, and plaintiffs were not required to do so. Plaintiffs could continue to strip mine at ratios higher than that specified in the contract if they thought the price warranted their so doing.[4]

25. The contract price arrived at in the Reading contracts was arrived at after considering, among other things, the amount of overburden that was to be removed to obtain one ton of coal, the possibility of recoverable coal in the tract,

3. At least one court believes the expenses as outlined above are of doubtful relevance. See Usibelli v. Commissioner of Internal Revenue, 9 Cir., 1955, 229 F.2d 539, 543.

4. There were occasions when plaintiffs did continue to strip mine beyond the stated ratio, but generally it was unprofitable to do so.

and the length of the haul from the tract to the point of delivery.[5]

26. The negotiations between plaintiffs and Reading for the price of the work to be performed were originally conducted on behalf of Reading by the company's engineer in charge of coal stripping in the area. In determining whether to recommend acceptance of the price to the company, the company engineer had available an economic study prepared by another department of the company, which appraised the future market price of coal. His recommendation to Reading was based upon the fixed costs, his estimate, or the estimate furnished to him, of the future market price of coal, and a figure designed to insure a reasonable margin of profit.

27. The contracts provided for an increase or decrease in the price per ton of coal corresponding to a change in labor costs [6] (Article 38 of P-22, N.T. 38).

28. Except when labor prices changed, plaintiffs were paid the same price per ton of coal delivered whether or not Reading sold it or whatever price Reading obtained on the market. If Reading could not sell the coal or the market price fell, Reading still had to pay plaintiffs the contract price unless they closed the job down (N.T. 103, 109, 110, 156-7; see paragraph 30 below). There was no change in the contract price because of a change in the market.

29. The coal did not belong to plaintiffs. If Reading rejected the delivered coal, plaintiffs had no right to sell the coal without Reading's agreement. If Reading agreed, then plaintiffs could negotiate the sale of the coal to another colliery. Reading would then collect the purchase price from the buyer and pay plaintiffs the contract price per ton.

30. Reading, in its discretion, could entirely cancel and terminate the contracts prior to the completion of the stripping by giving thirty days' written notice to plaintiffs of its intention to do so (Article 23 in all of the Reading contracts).[7]

---

5. There is no evidence that plaintiffs, in bargaining for a contract price, contemplated that they would have the depletion tax deduction.

6. The two supplemental agreements to P-22 of August 20, 1945, and October 28, 1946, respectively raised the price from $1.75 to $1.85 and then to $2.00 (N.T. 35-9 and Exhibit P-1). Increases in wage payments and wage scales obtained by the United Mine Workers in a new United Mine Workers agreement resulted in a rise in the price of coal on the open market within the next three to six months following such increases.

7. Each of the Reading contracts, except P-22, contained the following language:
"Contractor covenants and agrees that Coal Company shall have the right to entirely cancel and terminate this contract, without specifying any reason therefor, upon thirty (30) days' notice in writing to Contractor of Coal Company's intention so to do, and in that event Coal Company shall not be liable to Contractor for any loss of anticipated profits or any other damages whatsoever."
Contract P-22 contained this clause:
"(b) Contractor further covenants and agrees that Coal Company shall have the right to temporarily suspend work under this contract at any time or times by giving Contractor written notice of Coal Company's intention so to do. Should any such temporary suspension be made and continue for a period of five (5) weeks, except in case of strike or lockout, Contractor may notify Coal Company in writing of Contractor's desire to cancel this contract and, if within thirty (30) days after receipt of said notice Coal Company fails to give Contractor a written order to resume work, then Contractor may thereupon, by written notice served upon Coal Company, forthwith cancel and terminate this contract. In the event of any such cancellation by Contractor, Coal Company shall not be liable to Contractor for any loss of anticipated profits or other damages whatsoever. If no such notice to cancel this contract has been given by Contractor and Coal Company desires at any time a resumption of the work under this contract, it shall so notify Contractor, and upon receipt of such notice Contractor agrees that he will, within five (5) days thereafter, resume operation."
Clause (a) of Article 23 required 30 days' written notice if the contract was to be cancelled after the contractor had completed stripping within the area and limits covered by that contract, but no

31. No particular duration of time was specified in the agreements with Reading or Stevens and plaintiffs continued to strip mine under the contracts until they reached the stipulated ratios embodied in the contracts and it was no longer profitable to continue stripping. Plaintiffs then had completed their contracts and such contracts were cancelled by mutual agreement. Neither Reading nor Stevens ever unilaterally terminated or suspended operations on any of the contracts.

32. The four or five tracts concerning which the Stevens agreements were made also are in the Good Springs area. In 1944, Stevens had an operating agreement with the owners of the land, the County Commissioners of Schuylkill County, paying them for the right to extract from the land any coal that they located. On or before December 31, 1944,[8] Western Anthracite (whose office is at Pottsville) contracted with the County Commissioners and got control of this land.

33. On, or before December 31, 1944, plaintiff Russell Huss made an oral agreement for plaintiffs with Anthony Mosseline, of Western Anthracite (hereinafter called "Western"), permitting plaintiffs to go on the land and prospect for coal in return for a stated royalty per ton. If plaintiffs found and uncovered coal, Western could never refuse to let plaintiffs take such coal off the land and sell the coal to whomever they wanted, providing they would pay Western all of their royalties. Thus, as soon as plaintiffs uncovered a vein of coal, a binding obligation was in force between them and Western.

34. There was also a working agreement between plaintiffs and Stevens [9] whereby plaintiffs, having the privilege of going on the land from Western, would find a vein of coal and show a sample of it to Joseph Jones of Stevens. A price would then be negotiated between plaintiffs and Stevens. Plaintiffs would deliver the coal to the Westwood colliery and Stevens would pay plaintiffs the agreed upon price and also pay Western the royalty obligation that plaintiffs had to the latter.[10]

35. These individual agreements between plaintiffs and Stevens for the coal from the particular vein contemplated a stated price per ton delivered to the colliery. The stated price per ton was determined after considering such factors as the market value of the coal at the time of the agreement,[11] the quality of the coal, and the length of the haul to the colliery. This agreed upon price was subject to renegotiation at any time.

36. Plaintiffs were not obligated to sell and Stevens was not obligated to buy. At any time Stevens could stop taking coal at the agreed price. If Stevens refused to take the coal, plaintiffs had the right to sell it on the open

such 30 days' written notice was required if cancellation was made at any other time under clause (b), as quoted above.

8. Plaintiff Russell Huss' testimony as to when Western Anthracite contracted with the County Commissioners for control of the lands is admittedly vague as to dates, since he "wasn't concerned about it at the time." He testified that in 1944 someone else could have gone on those lands and extracted coal that they located merely by making arrangements with the County Commissioners, but that in later years the land was controlled by Western Anthracite. At another point in the testimony, he added that he believed the agreement between Western Anthracite and the Commissioners was before "sometime in 1944." He also testified that

he made one agreement with Stevens in 1944, and that the others were in 1945, 1946, and 1947. There is no evidence when in 1944 such an agreement was made.

9. This agreement was made by Russell Huss and Joseph Jones, colliery superintendent of the Westwood colliery.

10. On some occasions, though, plaintiffs paid a royalty directly to Western. If plaintiffs had sold to someone other than Stevens, then they paid the royalty directly to Western.

11. This market price was necessarily affected by O.P.A. rulings during the period prior to 1947, since increases could only be secured by application to the Government.

market. But plaintiffs always sold their coal taken from Western lands to Stevens.

37. Paragraphs 7 (first sentence only, substituting the word "these" for the word "all" and deleting the words "but not limited to" and "quality"), 8,[12] 9 (amended to specify that the testimony did not make clear whether the Reading or Stevens contracts or both were involved) and 10 requested by plaintiffs are correct but are found by the court to be of slight or no relevancy.

All plaintiffs' requests for findings of fact which are inconsistent with the foregoing are denied.

## II. Discussion

Treasury Regulation 111, § 29.23(m)– 1, promulgated under the Internal Revenue Code of 1939, outlines the following standard in determining who is entitled to take the percentage depletion deduction for strip mining coal under §§ 23 (m) and 114(b) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(m) and § 114(b) (4):

> "The owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions * * * An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in minerals in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the mineral or timber, to which he must look for a return of his capital." [13]

The Supreme Court has stated in Burton-Sutton Oil Co. v. Commissioner of Int. Rev., 1946, 328 U.S. 25, 34–35, 66 S.Ct. 861, 867, 90 L.Ed. 1062, an oil depletion case, that "It is the lessor's, lessee's or transferee's 'possibility of profit'

from the use of his rights over production, 'dependent solely upon the extraction and sale of the oil,' which marks an economic interest in the oil * * *" not the title to the mineral in place. "As the oil is extracted and sold that economic interest in the oil in place is reduced and the holder or owner of the interest is entitled to his equitable proportion of the depletion as rent or royalty."

The Court of Appeals for the Third Circuit has recently considered this problem in Commissioner of Internal Revenue v. Mammoth Coal Co., 3 Cir., 1955, 229 F.2d 535, 537, rehearing denied, 3 Cir., 1956, 229 F.2d 539, and noted that "there is no general rule that a strip miner is or is not entitled to percentage depletion." What constitutes an economic interest will be determined by "the facts in each case."

■ Plaintiffs are not entitled to percentage depletion on amounts received under the Reading contracts based on these principles for the following reasons:

*A. The right of plaintiff to strip mine was terminable on thirty days' notice at the will of the owner of the coal lands.*

Under the agreement in the Mammoth case, supra, the court said 229 F.2d at page 538:

> "The stripper had the exclusive right to mine coal in the areas embraced by the agreement. This exclusive right was not limited in time but was to continue indefinitely. The [Coal Co.] did have the right to call for a suspension of mining operations, and in such event under certain conditions regarding time and notice the stripper was free to give up the mining operation, but this was his own choice and unless he voluntarily did so, the [Coal Co.],

---

12. In view of the fact that these contracts could be terminated on 30 days' written notice, the provision reserving the area for plaintiffs is of very little, if any, relevance.

13. The regulation continued to state that: "* * * a person who has no capital

investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production."

though calling for a suspension of operations, could not permit anyone else to mine the area. Thus, for all practical purposes, the stripper had the exclusive right to mine the area to exhaustion."

On rehearing to consider the coal company's contention in the Mammoth Coal Co. case that "the contractor's rights were at all times terminable by the [Coal Co.]," the court found this not to be true,[14] and stated, 229 F.2d at page 539:

" * * * Usibelli v. Commissioner of Internal Revenue, 9 Cir., 229 F.2d 539, relied on by the taxpayer,

is in complete accord with the disposition which we made in the opinion filed by the Court in this case on November 30, 1955. In Usibelli the Court pointed out that the contract there was terminable at the will of the taxpayer mine owner."[15]

In the Reading contracts in this case, while it appears that the stripper had an exclusive right to mine coal in the areas embraced by the agreements,[16] such right was not to continue indefinitely. Plaintiffs have failed to sustain their burden in proving an oral variation of the terms of Article 23 (the Suspension of Work clause) in the written contracts[17] and

14. In the per curiam opinion on the petition for rehearing, the court found that the contract in question "was not terminable at will but only for cause, i. e., bankruptcy or default by [the coal company]." Commissioner of Internal Revenue v. Mammoth Coal Co., 3 Cir., 1956, 229 F.2d 535, 539.

15. In the Usibelli case, supra, the Ninth Circuit found that a coal stripper on land of the United States, under yearly contracts with the Army to mine specified tonnages for specified sums, was not entitled to depletion deduction for income tax purposes. On page 546 of 229 F.2d the court found that "the government could in its discretion terminate the contract. [The stripper] had no control over the production output of the mines being limited to the production of a specified amount of coal * * *. The coal came from [the United States'] lands and was used by it. [The stripper] took no title to it and accordingly [the stripper's] contention that the coal was sold to the Army is untenable * * *. [The stripper's] gain depended, not as is contended by him upon the severence and sale of the coal but upon the covenant of the United States government to pay him a certain sum for services performed. This sum was in no way affected by fluctuation of market price."

16. See plaintiffs' request for Finding of Fact 8, Finding of Fact 37, and footnote 12.

17. Plaintiff Russell Huss testified that he and George Huss, a week or two before they signed P-22, the first of the Reading contracts, had a conversation with Charlie Brown and Bill Mulhoff, of the Reading engineering department, at the Reading offices in Pottsville, concerning the cancellation clause in that contract. Plaintiff testified that they inquired whether, if they moved in on the property, spending $10,000 to $30,000 doing so, could Reading cancel out at any time with a 30-day notice, and that they were told that the "provision was put in there in a form contract so as if they got hold of a contractor who was not reputable, who didn't live up to the contract, they could put him off the property without court action."

Charlie Brown, a disinterested party to these proceedings, then took the stand and testified that he didn't recall any particular talk on the cancellation clause of the P-22 contract nor did he have any authority from Reading to alter the terms of their written contracts. Mr. Brown also testified that the operations here in question would not have been continued unless economically feasible. Further, in his opinion, Reading could have terminated the contract if its estimate of the future market price of the coal turned out to be a faulty estimate. But if the margin of profit became narrower, Reading would not necessarily have terminated the contract, but might have gambled on the length of the period.

Further, Article 13 of the Reading contracts provides as follows:

"No amendment to this contract shall be valid unless the same is made by an instrument in writing executed by Coal Company and by Contractor, and in case of such amendment, so much of this contract as is not necessarily thereby changed shall remain in force; and no act or conduct of either party shall be held to operate as a waiver of any provision of this contract, unless in writing duly executed by the party against which it is asserted."

at any time, with proper notice, Reading had the right to entirely cancel and terminate the contracts.

B. *Plaintiffs had a right to receive a fixed price per ton, irrespective of the market price.*

In the Mammoth case, 229 F.2d at page 538, the court said:

"Although all extracted material was to be delivered to the [Coal Co.], the [Coal Co.] specifically reserved the right to reject any and all coal or coal material delivered to it, and thereupon the stripper would be free to sell the rejected coal to anyone it pleased for its own account."

The Third Circuit Court, in awarding percentage depletion deduction to the stripper, reasoned that when the stripper removed coal from the ground, "the [Coal Co.] was entitled to receive it. But the [Coal Co.] was not obligated to take it. If it chose not to, it owed the stripper nothing, and the stripper would be free to sell the coal to any one at whatever price it could get."

With these factors in mind, the court concluded, also on page 538 of 229 F.2d that:

"The fact that, instead of retaining coal, the stripper received so much per ton for that coal which first had to be offered to and accepted by the [Coal Co.] should make no difference, for in any event the stripper had to look to the coal which it mined for return of its investment and profit."

On the other hand, the situation presented in the Reading contracts is one where plaintiffs were always required to sell the strip mined coal to Reading in return for a stated price per ton delivered to the colliery, such price being adjustable only to reflect the increase or decrease in plaintiffs' labor costs, but not any changes in the market price. If Reading rejected the coal, plaintiffs needed Reading's agreement to sell the coal to another colliery, and even then Reading collected the purchase price from the buyer and paid to plaintiffs the standard contract price per ton.

C. *The coal remained an asset of Reading, rather than of plaintiffs.*

The basic theory involved is "that the deduction be allowed to the owner of wasting assets as compensation for that part of his assets which are used up in production." Usibelli v. Commissioner of Internal Revenue, 9 Cir., 1955, 229 F. 2d 539, 542.[18] In Kirby Petroleum Co. v. Commissioner, 1946, 326 U.S. 599, 603, 66 S.Ct. 409, 411, 90 L.Ed. 343, the court stated the rule as follows:

"The test of the right to depletion is whether the taxpayer has a capital investment in the oil in place which is necessarily reduced as the oil is extracted. See Anderson v. Helvering, 310 U.S. 404, 407, 60 S.Ct. 952, 954, 84 L.Ed. 1277."

Also, in Commissioner of Internal Revenue v. Southwest Expl. Co., 1956, 350 U.S. 308, 312, 76 S.Ct. 395, 398, 100 L.Ed. 347, depletion was found to be "designed to permit a recoupment of the owner's capital investment in the minerals so that when the minerals are exhausted, the owner's capital is unimpaired." [19]

18. In addition, the Ninth Circuit stated, 229 F.2d at page 541, that "the depletion deduction * * * is not to be construed * * * as a reward to those persons who actually mine the coal for the risks inherent in extraction. In common with industry generally those engaged in extraction of minerals on a for-hire basis receive their tax benefit through depreciation and obsolescence allowances, and not through an allowance for the depletion of the mineral deposit on which they happen to be working." It is noted that plaintiffs here have received a tax bene-fit through depreciation deductions on their tax returns (see Finding of Fact No. 22).

19. In the Southwest Expl. Co. case, supra, 350 U.S. at pages 315 and 316, 76 S.Ct. at page 399, a drilling company which contracted to develop oil deposits lying offshore was denied the statutory depletion allowance available to the adjacent upland owner, since "permission to use the upland sites was the express condition precedent to the State's considera-

While the test for determining the presence of an economic interest in the mineral in place is not governed by ownership of the land, it is apparent that plaintiffs have not shown that they looked to the severance and sale of the mineral on the open market for their compensation. Instead, it appears that plaintiffs' compensation was directly dependent upon their personal covenants with Reading. The latter did not entitle plaintiffs to a depletion allowance. They, therefore, are not entitled to share in the benefits of a statute which was designed to give compensation to persons interested in the depletion of a wasting asset.

In conclusion, the Reading contracts contemplated: (a) the ability of Reading to terminate the contract at will upon thirty days' notice; (b) a stated price due plaintiffs notwithstanding any fluctuation in the market price; (c) plaintiffs' inability to sell the coal to another colliery on their own initiative; and (d) plaintiffs' not obtaining any separate interest in the coal itself other than that stated in the contractual arrangements.

These factors give the plaintiffs an economic advantage, rather than an economic interest, in the coal in place, and do not entitle them to a percentage depletion deduction.[20]

tion of Southwest's bid," and "proximity to the offshore oil deposits and effect of the state law combined to make the upland owners essential parties to any drilling operations." The upland owners had the requisite economic interest since they "might have realized this value by selling their interest for a stated sum and no problem of depletion would have been presented * * *." Their "contribution was an investment in the oil in place sufficient to establish their economic interest."

20. Plaintiffs rely upon the liberal view taken by the Fourth Circuit as to when a stripper acquires an economic interest, but all of the cases they cite are clearly distinguishable from the facts before this court.

In Commissioner of Internal Revenue v. Hamill Coal Corp., 4 Cir., 1956, 239 F. 2d 347, the contract between the stripper and the lessee-coal company contemplated that the stripper's return was to be dependent upon market conditions. The court, at page 350, stated that:

" * * * the contract. specifically provided that the obligation of the taxpayer [lessee-coal company] to pay for the extraction of 16,000 tons of coal per month was dependent upon market conditions, the taxpayer agreeing on its part to give the coal mined by Daniel [coal stripper] the preference in making sales. Thus the parties themselves recognized that the success of the venture and the return to them of their respective investments depended upon the taxpayer's ability to make advantageous sales of the product."

Further, the coal stripper there had the duty to furnish at least 16,000 tons of coal per month if the market conditions permitted. Also, annual gross receipts of the strip miner exceeded $500,000. As opposed to this, there is no evidence in the record in this case as to how much coal was available at the minimum acceptable stripping ratio nor the gross receipts from either the Reading or the Stevens contracts. Also, the only statement in the Reading contracts which involved any definite production obligation was Article 22 of the contracts, under which plaintiffs agreed "to produce, and to maintain the stripping and mining operations in condition to produce, the maximum number of gross tons of raw coal obtainable per single seven (7) hour shift, beginning at a reasonable. time after the date of this contract and continuing thereafter to completion of the project." But there was nowhere a showing that plaintiffs had to .have more than one man on each seven-hour shift. Further, there is no evidence of the gross receipts of the partnership from either the Reading contract or the Stevens contract.

The following conclusion of the Fourth Circuit on the above facts, at page 350, is, therefore, not inconsistent with the result reached here:

"In our opinion these conditions created an economic interest in the mineral in place not only in the taxpayer but also in Daniel, both of whom made a substantial investment and took a substantial risk dependent upon the successful sale of· the· coal."

In contrast to the Hamill case, in this case plaintiffs were assured of receiving the stated price per ton of coal produced and the above stated factors were not present. Also, if Reading could not buy the coal, plaintiffs could sell to another and still receive the stated contract price.

The oral agreements comprising the "Stevens contracts," though, are factually very different from the Reading contracts. Subject to plaintiffs' paying royalties to Western, once they found and uncovered coal, they could remove the coal and sell it to anyone. By the contracts with Stevens, the coal was delivered to the Westwood colliery in return for a stated price per ton, but Stevens was not obligated to buy nor were plaintiffs obligated to sell. At any time plaintiffs or Stevens could have discontinued the arrangement and plaintiffs' investments would have been subject to the price of coal on the open market. Further, plaintiffs alone could at any time have stopped strip mining if it was

Similarly, Weirton Ice & Coal Supply Co. v. Commissioner of Int. Rev., 4 Cir., 1956, 231 F.2d 531, cited by plaintiffs, is distinguishable from the facts of our case. In the Weirton case, the stripper, who had owned the coal lands, conveyed them at cost to a steel company under an agreement whereby the stripper was to have the exclusive right to mine coal and the land was to be reconveyed to the stripper when the coal was exhausted. Though many of the other provisions of the arrangement were similar to those in the Reading contracts, the conveyance at cost and the contemplated reconveyance clearly entitled the strippers to their percentage depletion.

In the case of Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 1954, 212 F.2d 52, cited in Commissioner of Internal Revenue v. Mammoth Coal Co., supra, 229 F.2d at page 539, as having reached a correct result on the fact situation before it, the coal stripping contracts were very different from the Reading contracts in this case, as indicated under A and B below:

A. As to coal stripping being done by the Swaney Contracting Company and Swaney, Inc. for the lessor of the land, Vincent:

1. At pages 56 and 59, of 212 F.2d the court recognized that in the arrangements with both Swaney companies "provision was made for adjustment on this compensation in the event of changes in the sales price of the coal." The court also recognized, at page 56, that the stripper, Swaney Contracting Co., "was to be paid for its services on the basis of the coal accepted and paid for by * * * the sales agent of [the coal company]." A similar arrangement existed as to Swaney, Inc. As to Swaney Contracting Co., "the contract was not cancellable except on specified defaults by the parties or in the event that the sales price on the coal fell below $2.76 per ton." As to Swaney, Inc., the lessor, Vincent, could cancel the contract only "if the price of the coal fell to a point where the operations were unprofitable to him."

2. Further, also at page 59, the court noted that the Swaney companies were to "haul a large tonnage per month, and the production was to be continuous and as uniform as possible." Swaney Contracting Co. alone was required to mine and haul "25,000 tons of coal a month", at page 55. See the discussion above in this footnote that plaintiffs in the Reading contracts were not under a similar obligation.

B. In respect to the coal stripping being done by the Summit Fuel Company for the lessee, Gregory Run Coal Company, there was, similarly, a very different factual situation from that present in the Reading contracts:

1. The Gregory Run Company was owned equally by Vincent (the lessor of the land, to the Gregory Run Co.) and a Mr. Williamson. These same parties also each held one-half of the stock in the Summit Fuel Company. Thus, both the lessee and the stripper were owned by the same persons. The court characterized the arrangement between them on page 55, footnote 2, as a "joint adventure."

2. Further on in the same footnote, the court stated that "either party had the right to cancel the agreement except that in case Gregory served notice of cancellation, then Summit should have the right to mine and remove all the coal which had been uncovered at that time." This clearly gave the stripper distinct rights over the coal in place immediately upon uncovering it.

Even were the views of the Fourth Circuit, as stated in the above three cases, to be at variance with those herein expressed, this court is bound by the views of the Court of Appeals for the Third Circuit.

See, also, The Virginia B. Coal Co. v. Commissioner, 1956, 25 T.C. 899, where the coal stripper was held entitled to a depletion allowance because the method for computing the amount which the strippers were to be paid clearly indicated that their possibility of profit and, hence, the recovery of their investment, was dependent to a large extent upon the sale of the coal.

not, in their opinions, profitable to continue.

While plaintiffs, in both the Reading and Stevens contracts, continued to strip mine until no longer profitable and then mutually agreed with the coal company to cancel the contract, only in the Stevens arrangements did they have the undisputed right to continue strip mining after coal had been uncovered. As distinguishable from the Reading contracts, in the Stevens arrangements the stripper, instead of looking merely to a contractual arrangement, had to look to the coal which it mined for return of its investment and profit.[21]

Although it is a close case, the economic interest which the strippers acquired in the Stevens contracts was sufficiently significant to entitle them to percentage depletion.

### III. Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter.

2. Plaintiffs, in strip mining under P–22, P–22B, P–29, P–30, P–32 and P–35 for the Philadelphia & Reading Coal & Iron Co., in the tax years 1944 to 1947, inclusive, did not acquire an economic interest in the coal in place, entitling them to the depletion allowance on their gross income derived therefrom, pursuant to Sections 23(m) and 114(b) of the Internal Revenue Code of 1939.

3. Plaintiffs, in strip mining under oral contracts with the Stevens Company in the tax years 1945 to 1947, inclusive, did acquire an economic interest in the coal in place, entitling them to the depletion allowance on their gross income derived therefrom, pursuant to Sections 23(m) and 114(b) of the Internal Revenue Code of 1939.

4. Plaintiffs have not sustained their burden to prove any definite arrangement of the type outlined in Findings of Fact Nos. 32 to 36 with Stevens or Western for strip mining coal prior to December 31, 1944,[22] and, hence, are not entitled to the depletion allowance under Sections 23(m) and 114(b) of the Internal Revenue Code of 1939 on their 1944 gross income from the Stevens contracts.

5. Plaintiffs' motion filed January 11, 1957, for leave to amend the caption of the complaint to include the United States of America as a party defendant has become moot in view of Findings of Fact Nos. 32 and 33 and Conclusion of Law No. 4.[23]

---

21. From the Stevens contracts it is clear that plaintiffs did acquire an economic interest in the coal in place immediately upon uncovering the coal. From that point on, they acquired such an interest as met the various tests described in C above.

22. The date that Western got control of the involved lands was not established further than "sometime in 1944," and the contradiction exists that in that same year someone else could have made an agreement directly with the County Commissioners and gone upon the land and extracted the coal. Plaintiffs have not sustained the burden of proving the exclusive right to mine the coal they prospected at the time of the alleged one agreement in 1944 with Stevens.

23. This ruling whether the court has jurisdiction to permit this amendment (since the claims for refunds on which these actions are based were all disallowed by the Commissioner of Internal Revenue more than two years ago (Stip. par. 3 and Finding of Fact No. 8)), is un-necessary unless an appellate court modifies such findings and conclusion. For a consideration of the merits of this issue, compare Section 3772(a) (2) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 3772(a) (2); Third National Bank & Trust Co. of Springfield, Mass. v. White, D.C.D.Mass.1932, 58 F.2d 411; Philadelphia H. & P. R. Co. v. Lederer, 3 Cir., 1917, 242 F. 492; and Toledo Railways & Light Co. v. McMaken, D.C.N.D.Ohio 1936, 17 F.Supp. 338, with Section 3770 (b) of the 1939 Internal Revenue Code, 26 U.S.C.A. § 3770(b); 28 U.S.C.A. §§ 1346(a) and 2006; F.R.Civ.P. 15(c) and 21, 28 U.S.C.A.; Moore Ice Cream Co. v. Rose, 1933, 289 U.S. 373, 380–384, 53 S.Ct. 620, 77 L.Ed. 1265; Hammond-Knowlton v. United States, 2 Cir., 1941, 121 F.2d 192; Lamar v. Granger, D.C. W.D.1951, 99 F.Supp. 17, 45; and United States v. Koike, 9 Cir., 1947, 164 F.2d 155. Cf. Ferd Mulhens, Inc., v. Higgins, D.C.S.D.N.Y.1943, 55 F.Supp. 42, 44, and Rogan v. Delaney, 9 Cir., 1940, 110 F.2d 336.

6. 33 P.S. § 1 has no application to the Stevens contracts.[24]

The parties shall, within thirty (30) days of the date of the filing of these Findings of Fact and Conclusions of Law, submit their determination as to the amount of refund due plaintiffs in conformance with the above opinion.

---

24. The Statute of Frauds is inapplicable on the facts of this case for any one of the following reasons: (A) The Statute of Frauds cannot be raised by third parties where there is no privity of contract. Restatement of Contracts, § 218; 2 Williston on Contracts, § 530 (Rev.Ed. 1936). See Burkhart v. Farmers' Union Insurance Co., 1899, 11 Pa.Super. 280, 290–291; Berenato v. Gazzara, 1943, 346 Pa. 568, 31 A.2d 81; and Dietrich v. K. D. T. Coal Co., 61 Dauph.Co., Pa., 304. See, also, Smoot v. Commissioner, 1932, 25 B.T.A. 1038. (B) Expenditure of money on the faith of the parol agreements makes for a binding contract giving absolute rights. Cole v. Ellwood Power Co., 1907, 216 Pa. 283, 289, 65 A. 678; Klingensmith v. Klingensmith, 1953, 375 Pa. 178, 181, 100 A.2d 76; and Haskell v. Heathcote, 1949, 363 Pa. 184, 69 A.2d 71. (C) The Statute of Frauds does not apply to agreements which have been completely executed and performed on both sides. Gerlock v. Gabel, 1955, 380 Pa. 471, 476, 112 A.2d 78; Edwards v. Glaske, 1949, 165 Pa.Super. 108, 67 A.2d 798; Leap v. Leahey, 1917, 67 Pa.Super. 337; and Sferra v. Urling, 1937, 328 Pa. 161, 195 A. 422. (D) Each of the oral agreements could have been performed within "the term of three years from the making thereof." See Bentz v. Barclay, 1928, 294 Pa. 300, 144 A. 280.