239 F.2d 347
 57-1 USTC P 9259
 COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
HAMILL COAL CORPORATION, a Dissolved Corporation, Frank
Correale, Palmer Correale and Fred Correale,
Directors at the Time of Dissolution and
Statutory Trustees, Respondents.
 No. 7204.
 United States Court of Appeals Fourth Circuit.
 Argued Nov. 14, 1956.
Decided Dec. 13, 1956.
 
 Walter Akerman, Jr., Attorney, Department of Justice, Washington, D.C. (John N. Stull, Acting Asst. Atty. Gen., Robert N. Anderson and Hilbert P. Zarky, Attorneys, Department of Justice, Washington, D.C., on brief), for petitioner.
 Fred L. Rosenbloom, Philadelphia, Pa. (Thomas P. Glassmoyer, and Schnader, Harrison, Segal & Lewis, Philadelphia, on brief), for respondents.
 Before PARKER, Chief Judge, SOPER, Circuit Judge, and R. DORSEY WATKINS, District Judge.
 SOPER, Circuit Judge.
 
 
 1
 This case involves the incomes taxes of the Hamill Coal Corporation for the year 1947 and is specifically directed to the amount of depletion allowance which should be deducted, under §§ 23(m) and 114(b)(4)(A) of the Internal Revenue Code 1939, 29 U.S.C.A. §§ 23(m), 114(b)(4)(A), from the gross income of the corporation from strip mining operations in that year. The taxpayer was the lessee of certain coal bearing lands in Virginia and West Virginia and claimed the right to a percentage deduction on the total amount of its gross sales of coal, less the amount of royalties paid to the lessor. The Commissioner, on the other hand, held that in calculating the amount of the allowable depletion there must also be deducted from the amount of the gross sales the sums paid by the taxpayer to the Daniel Coal Company which actually performed the strip mining operations under a contract with the taxpayer. Accordingly, the Commissioner determined a deficiency for the tax year in the sum of $11,077.85, which on review the Tax Court reversed. The case is now before us on the Commissioner's petition for review of the Tax Court's decision. The crucial question for our determination is whether the Daniel Coal Company had such an economic interest in the mineral in place as to entitle it to share in the depletion allowance, which at that time, in the case of coal mines, was 5% of the gross income from the property, excluding therefrom the amount paid by the taxpayer in rents or royalties.
 
 
 2
 In 1944 the taxpayer and the Daniel Coal Company entered into a contract for strip mining the coal from a seam in certain tracts of land in Buchanan County, Virginia, and McDowell County, West Virginia, from which the taxpayer had the right under leases from the owner to remove all the coal in consideration of the payment of certain royalties and the payment of all state or federal taxes imposed upon the coal mined therefrom. The estimated tonnage of the coal in place was 3,000,000 tons and the leases were written for initial terms of ten and twelve years with renewal options.
 
 
 3
 Under the contract with Daniel the taxpayer was required to construct a tipple and a road two miles in length from the tipple to the seam of coal, and Daniel was required to maintain the road and build all other roads needed in the operation. Daniel agreed to strip mine all of the coal in the seam having an overburden of 40 feet or less and was given the right to mine under a heavier burden but was not obligated to do so. The taxpayer had the right, within reason, to designate the location of the operations.
 
 
 4
 The contract also provided that Daniel should deliver the coal to the tipple, as free from impurities as was reasonably possible, and that Daniel should furnish all the equipment necessary for the stripping, loading and delivery of the coal, and should pay all property taxes on its equipment, and social security taxes and compensation insurance on its employees. Each party agreed to pay the liability insurance covering its part of the work. Daniel agreed to cast the overburden and waste in such places as might be most convenient and economical to it subject to taxpayer's right, to be reasonably exercised, to designate places upon which no overburden or waste might be cast. Daniel was under no duty to replace overburden or fill excavations.
 
 
 5
 The taxpayer agreed to pay Daniel $1.60 per ton of 2,000 pounds for coal delivered to the tipple, and the taxpayer agreed to accept, and Daniel agreed to furnish, not less than 16,000 tons per month, if market conditions permitted. The taxpayer agreed to use its best efforts to market the coal and to give preference to the coal extracted by Daniel over any other coal which it might mine or have for sale over the tipple. The contract was to continue for one year and from year to year thereafter with the right of either party to terminate it at any time upon 90 days' written notice.
 
 
 6
 The parties proceeded with the operations according to the terms of the contract, the taxpayer exercising complete control over the sales of all coal and paying Daniel the rate per ton provided by the contract, which was modified by agreement from time to time to cover Daniel's increased costs.
 
 
 7
 Theretofore, Daniel had been primarily a builder of roads and airports and had not engaged in mining operations. Some equipment which it had previously owned was used in the strip mining operations, and additional equipment was purchased in the sum of $103,300.34. All of the equipment which remained usable at the expiration of the contract was removed by Daniel.
 
 
 8
 The roadway constructed by the taxpayer was not of sufficient size and Daniel was obliged to improve and widen it and also to construct an additional 800 feet of roadway to reach another seam. The materials for road building were furnished by the taxpayer. The coal mined was hauled to the tipple in trucks rented by Daniel.
 
 
 9
 Generally speaking Daniel's operations consisted in the removal of the overburden, cleaning the surface of the coal seam, removing two partings of impurities, loading the coal into trucks and hauling it to the tipple. At the tipple the taxpayer further cleaned and sized it.
 
 
 10
 The market price of the coal varied according to its size; but regardless of the size the taxpayer paid Daniel the agreed rate per ton, which was increased from time to time to cover changes in the wage scale of Daniel's employees. No adjustments in the rate paid Daniel were made on account of fluctuations of price. Daniel took no part in the selling of the coal.
 
 
 11
 The contract was terminated by mutual agreement in September, 1947, after Daniel had removed substantially all the coal with an overburden of less than 40 feet. In all, he extracted 937,000 tons of the estimated total of 3,000,000 tons in the mine. Subsequently the taxpayer strip mined approximately 10,000 tons per month during the next 9 months.
 
 
 12
 The gross income of the taxpayer in 1947 from the sales of coal in the mine amounted to $1,339,620.04, of which Daniel was paid $583,044.70 under the contract, and the lessors were paid $74,319.71 for royalties under the leases. Upon this state of facts the Tax Court held that Daniel was not entitled to share in the depletion allowance and hence the taxpayer's allowance should be computed without deduction of the amounts paid Daniel.
 
 
 13
 It is agreed that the right to a depletion allowance is dependent upon the ownership of an economic interest in the mineral deposit and that when more than one person has such an interest the allowance must be equitably apportioned between them. It is also agreed that title to or ownership of the deposit is not essential to the creation of an economic interest therein. It is enough if the taxpayer has acquired by investment any interest in the mineral in place and secures by any form of legal relationship income derived from the severance and sale of the mineral to which he must look for the return of his investment. However, a taxpayer who has no capital investment in the deposit does not possess an economic interest merely because by contract with the owner he possesses an economic advantage derived from production. See § 29-23(m-1) of Treasury Regulations 111.
 
 
 14
 The taxpayer takes the position that Daniel had no economic interest on the grounds that it had no control of the exploitation of the mineral and no share either in the mineral itself or in the income derived from its extraction and sale. It is pointed out that the taxpayer had the right to extract an estimated 3,000,000 tons of coal from the lands and that Daniel was employed to extract the coal most easily recoverable which, in the course of three years, amounted to less than one-third of the total; and it is said that Daniel did not have the exclusive right to extract even this amount because the contract referred to other coal which the taxpayer might mine or have for sale over the tipple. Also stressed as inconsistent with a substantial interest on Daniel's part in the operation are the circumstances that the taxpayer retained the right to designate the location of the operations, and the place where the overburden should be cast, as well as the obligation to provide a road for the carriage of the mineral to the tipple and to backfill the lands and to pay the taxes on the property. Finally, it is emphasized that the taxpayer had the sole responsibility for marketing the product and that the extent of Daniel's operations depended upon the taxpayer's success in this respect; and since Daniel was not entitled to a share of the mineral extracted and its compensation was not governed by the sale price of the product but was fixed by the contract, it is said that Daniel assumed no risk in the venture but was merely the hireling of the lessee.
 
 
 15
 These observations are pertinent but when the whole case is considered they do not justify the conclusion that Daniel had no economic interest in the enterprise, as that phrase has been interpreted by the Courts. It is plain, in the first place, that Daniel acquired an interest in the mineral in place by the contract with the lessee, whereby Daniel was not only permitted but obliged to mine all the coal in the seam under an overburden of 40 feet or less at a fixed sum per ton. The suggestion that this right was qualified and not exclusive since the contract referred to other coal which the taxpayer might mine or have for sale over the tipple is lacking in substance. The record fails to show in what other coal the taxpayer may have been interested unless it was the coal in the seam buried more than 40 feet below the surface and, as the event proved, Daniel in the course of three years actually mined all of the coal of less depth in the seam, amounting to 937,000 tons. The terms of the contract would not have justified the intrusion of another operator into the field allotted to Daniel.
 
 
 16
 Daniel not only had the right to mine the coal but he assumed the obligation to make-- and did make-- a substantial investment in the enterprise. This included not only the outlay required to maintain the road constructed by the taxpayer but also the duty to build and maintain other necessary roads; and since these roads were of no value to Daniel after the termination of the contract it could look only to the amounts paid to it under the contract for the return of the investment. Daniel also committed to the risks of the business equipment which he already owned and new equipment which he acquired at the cost of $103,300.34. Whether all or any of this outlay would be recovered also depended in large measure upon the success of the enterprise, for the contract specifically provided that the obligation of the taxpayer to pay for the extraction of 16,000 tons of coal per month was dependent upon market conditions, the taxpayer agreeing on its part to give the coal mined by Daniel the preference in making sales. Thus the parties themselves recognized that the success of the venture and the return to them of their respective investment depended upon the taxpayer's ability to make advantageous sales of the product. It is beyond question that Daniel had a substantial part in the production of the mineral, and a substantial interest in the success of the business.
 
 
 17
 In our opinion these conditions created an economic interest in the mineral in place not only in the taxpayer but also in Daniel, both of whom made a substantial investment and took a substantial risk dependent upon the successful sale of the coal. We have had occasion in recent cases to travel this field of the law and we find no vital distinction in the facts between this case and those considered by us in Weirton Ice & Coal Supply Co. v. Commissioner, 4 Cir., 231 F.2d 531. See also Commissioner of Internal Revenue v. Mammoth Coal Co., 3 Cir., 229 F.2d 535; Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395.
 
 
 18
 The order and decision of the Tax Court will be reversed and the case remanded for further proceedings.
 
 
 19
 Reversed.