NATHAN FINK AND GERTRUDE FINK, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 57387–57390.   Filed March 20, 1958.

*Leon H. Kline, Esq.*, for the petitioners.
*Albert Squire, Esq.*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in income taxes and additions to tax as follows:

| Docket No. | Petitioners | 1951 | 1952 | |
|---|---|---|---|---|
| | | Income tax deficiency | Income tax deficiency | Additions to tax, sec. 294(d)(2) |
| 57387 | Nathan Fink and Gertrude Fink | $5,388.16 | $5,820.51 | $380.04 |
| 57388 | Alex Fink and Beatrice Fink | 5,887.28 | 5,396.06 | 308.92 |
| 57389 | Anthony Perry and Myrtle Perry | 1,766.50 | 216.20 | |
| 57390 | Anthony Costa and Helen Costa | 1,498.84 | | |

[1] Proceedings of the following petitioners are consolidated herewith: Alex Fink and Beatrice Fink, Docket No. 57388; Anthony Perry and Myrtle Perry, Docket No. 57389; Anthony Costa and Helen Costa, Docket No. 57390.

The issues presented for determination are:

(1) Whether the partnership, Perry Construction Company, had an economic interest in the coal which it strip mined so as to be entitled to a deduction for percentage depletion therefor in the taxable years ended April 30, 1951 and 1952.

(2) Whether the partnership, Perry Construction Company, sustained a deductible loss in the taxable year ended April 30, 1951, with respect to advances made to the Pennsylvania School of Excavating Equipment.

(3) Whether the upset of a Link Belt shovel, belonging to the partnership, Perry Construction Company, occurred about May 1, 1950, or on August 24, 1950.

### FINDINGS OF FACT.

Some of the facts are stipulated and the stipulation is adopted as findings of fact.

Anthony and Helen Costa, husband and wife, for the calendar year 1951; Nathan and Gertrude Fink, husband and wife; Alex and Beatrice Fink, husband and wife; and Anthony and Myrtle Perry, husband and wife, for the calendar years 1951 and 1952, filed joint individual income tax returns with the then collector of internal revenue for the twelfth district of Pennsylvania.

The Perry Construction Company (hereinafter referred to as Perry), a partnership, maintained its office at Scranton, Pennsylvania. The partners were Nathan Fink and Alex Fink, general partners, and Gertrude Fink, Anthony Costa, and Anthony Perry, limited partners. Anthony Costa's interest in the partnership ceased as of July 31, 1951. The partnership filed its income tax returns on the basis of an April 30 fiscal year.

During the years in question and for a number of years prior thereto, Perry was engaged in the business of strip mining coal in the anthracite fileds in the vicinity of Scranton, Pennsylvania. The strip mining was carried on principally pursuant to contracts which the partnership had entered into with the Hudson Coal Company and the Glen Coal Company.

Perry entered into the following contracts with the Hudson Coal Company:

| Date | Area to be mined | Price per ton | Point of delivery |
|---|---|---|---|
| Feb. 6, 1950 | #34 Tunnel Area Delaware Colliery | $4.50 | Pine Ridge or Laflin Colliery. |
| Sept. 6, 1950 | Olyphant Colliery | 4.59 | Olyphant Colliery. |
| Sept. 28, 1950 | Diamond Bed Marvine Farm | 3.00 | Olyphant Colliery. |
| May 1, 1951 | East Side Pine Ridge Colliery | 4.25 | Pine Ridge Colliery. |
| May 3, 1951 | Fourteen Foot Beds Marvine Farm | 4.50 | Olyphant Colliery. |
| July 30, 1951 | #43 Tunnel Section Delaware Colliery | 4.25 | Pine Ridge Colliery. |

The pertinent provisions of the contract of February 6, 1950, to which the provisions of the other contracts are largely similar, are as follows:

(a) The quantity of coal recoverable from said area is not guaranteed by The Hudson Coal Company, but you shall mine and remove the coal by careful, efficient and workmanlike stripping methods, to the end that all coal is mined which can be economically recovered.

\* \* \* \* \* \* \*

(c) All coal delivered as aforesaid shall be as free from middle rock, bone, slate or other refuse as is reasonably possible to clean it as it is loaded. No soft or badly discolored coal will be accepted by The Hudson Coal Company.

(d) The quantity of coal delivered to The Hudson Coal Company under this acceptance shall be weighed at the Pine Ridge or Laflin Colliery weigh scales and shall there be subject to standard colliery dockage. The coal delivered by you in each semimonthly period, less dockage, if any, shall be credited to you in terms of tons containing 2240 pounds. Semimonthly periods shall end on the fifteenth and last day of each month.

\* \* \* \* \* \* \*

It is understood for the above mentioned rate per ton you will furnish everything required for the performance of this work, including all labor, material and equipment.

\* \* \* \* \* \* \*

(g) You may grade and use driveways for the prosecution of this work on the land of The Hudson Coal Company adjacent to the area covered by this contract without charge, provided such driveways shall not interfere with any operations of The Hudson Coal Company.

(h) You shall have the right to use The Hudson Coal Company land adjacent to the area covered by the contract for the use of any buildings or improvements required for this work.

\* \* \* \* \* \* \*

(j) All buildings erected by you on The Hudson Coal Company's land for use in connection with this job shall be removed by you within thirty (30) days from the date of termination of this job, on failure of which said buildings shall be forfeited to The Hudson Coal Company.

(k) This contract is made under and subject to "The Hudson Coal Company's General Conditions of Contract," dated August 17, 1946, a copy of which is hereto attached and hereby made a part hereof, with the same force and effect as though said General Conditions were written out at length herein.

(1) It is expressly agreed that The Hudson Coal Company shall be entitled to the full amount allowable as a deduction in United States income tax returns for "percentage depletion" upon the coal mined under this contract; that you are not intended to have any economic interest in the coal to be mined hereunder or to receive credit for any part of said percentage depletion but have been fully compensated therefor by The Hudson Coal Company in the rates and conditions herein provided.

The pertinent provisions of the General Conditions of Contract dated August 17, 1946, provide as follows:

(5) The Hudson Company, does not guarantee that the Contractor will be permitted to operate continuously, and it also reserves the right at its discretion, without liability for damage or loss to the Contractor, to suspend from time

to time or terminate entirely all or any part of the work covered by this contract. If this contract shall provide for payment to the Contractor for "delays" by the Hudson Company, such suspensions shall not be considered to be delays. In the event of any such partial termination, the Contractor within two weeks from the date thereof, but not thereafter, may terminate this contract in its entirety upon 24 hours' notice, without incurring any penalty or forfeiting any amount earned for work performed, and in the event any such suspension shall continue for a period of two weeks or more, the Contractor upon like notice and with like immunity may abrogate this contract at any time before having received notice to resume work.

   \*      \*      \*      \*      \*      \*      \*

(10) The Contractor shall insure the payment of compensation to the Contractor's employes as required by The Pennsylvania Workmen's Compensation Act and The Pennsylvania Occupational Disease Act, and their respective amendments and supplements, and expressly assumes the entire responsibility for such workmen's compensation and occupational disease compensation, and for all personal injuries, death or damages sustained by the Contractor or his or its officers, agents, and employes, whether occasioned by the negligence of the Hudson Company, its officers, agents or employes or otherwise, and also for any and all loss or damage through theft, loss, injury, destruction or howsoever to the Contractor's property or equipment and the property or equipment of the Contractor's employes, of whatever kind or character, wherever situate and howsoever occasioned, hereby releasing and discharging and agreeing to fully and completely idemnify and save harmless the Hudson Company from all and every claim or demand on account of such workmen's compensation and occupational disease compensation, or for on account of any claims, demands or actions for such personal injuries, death or damages, or for or on account of such loss of or damage to property.

   \*      \*      \*      \*      \*      \*      \*

(12) The Contractor shall make all collections and reports and payments to the proper state and federal authorities covering all contributions, levies, imposts or taxes of any kind required to be made or paid during the term of this contract by the Federal Social Security Act or the State Unemployment Compensation Act, or any other state or federal law now or hereafter enacted, on account of the hiring by the Contractor of any person or persons to perform the work, or any part of it, provided to be done by this contract, or on account of the wages paid to such person or persons, and whether the obligation to make such reports and payments is the primary duty of the Contractor or the Hudson Company. \* \* \*

The contract with the Glen Coal Company dated June 14, 1950, provided that Perry could mine the property leased by the Glen Coal Company from the Hudson Coal Company, the coal to be delivered to a Hudson colliery for a specified price for each ton of 2,240 pounds, under the same conditions of the general contracts entered into with the Hudson Coal Company by Perry.

Perry possessed equipment costing $250,000 in February 1950, the date of the first contract involved in these taxable years, and possessed equipment costing $500,000 at the conclusion of the taxable year ended April 30, 1952. Perry supplied all materials necessary for the op-

eration of the mines, constructed roads and buildings, and paid for all expenses during the years in question.

The Hudson Coal Company at various times exercised its right to suspend coal deliveries and Perry stockpiled the coal it mined during such periods. Perry delivered the following coal during the years in question and received the following amounts therefor under the contracts for strip mining:

| Stripping contract | 1951 | | 1952 | |
|---|---|---|---|---|
| | Coal tons | Amount | Coal tons | Amount |
| Hudson Coal Company | 83,112.36 | $352,070.39 | 121,204.32 | $476,870.25 |
| Glen Coal Company | 41,422.59 | 190,543.92 | 5,324.18 | 25,023.65 |
| Others | 10,533.87 | 58,405.27 | 8,304.95 | 46,187.42 |
| Total | 135,068.82 | 601,019.58 | 138,833.45 | 548,081.32 |

In computing its net income for the years in question, Perry claimed a depletion allowance on the sales of the coal based on the above receipts.

On October 31, 1947, Perry purchased a Link Belt shovel, model K370-1906, at a cost of $28,600. For the purpose of determining depreciation, the life of the shovel was estimated at 5 years. At the close of the partnership's fiscal year ended April 30, 1950, the adjusted basis of the shovel on its books was $14,300. The shovel suffered damage on upsetting. The partnership and its insurance carrier adjusted the loss occasioned by the upset at $9,900, which amount was received by the partnership on October 13, 1950. This amount was used to adjust the basis of the shovel at the date of the upset. The shovel upset occurred on August 24, 1950.

Shortly after the war petitioner Nathan Fink was approached by Jacob Shiffman concerning the possibility of creating and developing a school to instruct individuals in the operation, maintenance, and usage of mining equipment. The idea was well received by Nathan Fink because there was a shortage of operators and skilled men in the mining operation at that time and the cost of training them to operate the machinery was an expensive proposition. The plan was to establish a school under the auspices of the United States Veterans' Administration, which was to reimburse the school for its expenses and costs in training veterans.

The Pennsylvania School of Excavating Equipment (hereinafter referred to as the school), a partnership, was established in the summer of 1949. The partners were Nathan Fink and Jacob Shiffman on a 50-50 basis. Alex Fink was to absorb 50 per cent of any loss and Nathan Fink was to absorb the other 50 per cent of any loss. Perry

sold equipment to the school in the total amount of $31,000. The school obtained a loan from the bank in the amount of $15,000, for which it signed a note. Perry endorsed the note for the bank and the note was secured by a mortgage on the equipment purchased by the school from Perry. Additional sums were loaned by Perry to the school for operating expenses.

Nathan Fink and Jacob Shiffman negotiated with the Veterans' Administration for the amount to be paid the school for its costs. The partners themselves computed $140 per month per student as the amount needed to operate the school. Nathan Fink understood that the Veterans' Administration office at Wilkes-Barre, Pennsylvania, thought $90 per student per month was sufficient. However, before the school could receive any moneys, the partners were required to sign a contract agreeing to a certain amount. The contract which they actually entered into called for payments of $46.85 per month for each day student and one-half of that amount for each night student. The contract also provided for a reservation of the right of the school to seek a greater rate of tuition from the Veterans' Tuition Appeals Board. Nathan Fink signed the contract calling for payments from March 1 to May 31, 1950, at $46.85, and filed an appeal with the Veterans' Tuition Appeals Board for additional sums.

The school began operations in August 1949 and operated for approximately 10 months with about 20 students. Following receipt from the Veterans' Administration of a payment of approximately $45 per student per month of operations, Nathan Fink decided the school would cease operations on May 28, 1950. The equipment sold by Perry to the school was returned to Perry at its depreciated cost.

The debt owing from the school to Perry was $19,318.21, after return of the equipment. On June 15, 1950, this debt was canceled on assignment to Perry of the school's rights in the claim then pending before the Veterans' Tuition Appeals Board. Nathan Fink acted on behalf of both parties to the assignment. The claim was given a value of $19,318.21 on the basis of $140 per student per month as the cost of operating the school, and crediting the $46.85 previously received from the Veterans' Administration against the $140 claim. The claim pending before the Veterans' Tuition Appeals Board actually had no value at the date of its assignment to Perry. Nathan Fink and Alex Fink had substantial assets from which Perry could have recovered the $19,318.21. Nathan Fink had never been insolvent. As of April 30, 1952, Nathan Fink's interest in Perry amounted to $53,351.37 and the interest of Alex Fink amounted to $79,392.15.

Perry did nothing further to press the claim against the Veterans' Administration. Sometime after June 15, 1950, the date of the assignment, Nathan Fink discovered that the Veterans' Tuition Ap-

peals Board had gone out of existence. After consulting a lawyer, the partnership decided not to pursue the claim any further. Perry claimed a deduction of $19,318.21 on its income tax return for the taxable year ended April 30, 1951, as "Loss on Assignment."

The respondent determined that Perry did not own a depletable interest in the coal-mining operation, and that the loss on assignment was not allowable because the partnership had accepted a worthless debt in cancellation of its claim against the partners of the school. Respondent further determined that the upset of the Link Belt shovel occurred on or about May 10, 1950, and adjusted the depreciable basis as of the first of that taxable year, thereby reducing the depreciation allowance. Petitioners dispute these determinations.

OPINION.

*Issue 1. Whether the Perry Construction Company had an economic interest in the coal in place which it strip mined so as to be entitled to percentage depletion pursuant to sections 23 (m) and 114 (b) (4) of the Internal Revenue Code of 1939.*

Respondent determined that the contracts whereby Perry was given the right to strip mine certain properties did not give Perry an economic interest in the coal in place within the purview of sections 23(m) and 114(b)(4).[1] We agree with the respondent.

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions :

\* \* \* \* \* \* \*

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case ; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. In the case of leases the deductions shall be equitably apportioned between the lessor and lessee. In the case of property held by one person for life with remainder to another person, the deduction shall be computed as if the life tenant were the absolute owner of the property and shall be allowed to the life tenant. In the case of property held in trust the allowable deduction shall be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the instrument creating the trust, or, in the absence of such provisions, on the basis of the trust income allocable to each.

For percentage depletion allowable under this subsection, see section 114 (b), (3) and (4).

(n) BASIS FOR DEPRECIATION AND DEPLETION.—The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114.

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(b) BASIS FOR DEPLETION.—

(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of

The Supreme Court in the recent case of *Commissioner* v. *Southwest Exploration Co.*, 350 U. S. 308 (1956), restated the test for determining whether an interest is an economic interest in the mineral in place, which was first set forth in *Palmer* v. *Bender*, 287 U. S. 551 (1933). It stated at pp. 313, 314 :

In upholding the taxpayer's right to depletion on all such income, the Court based its decision on the grounds that a taxpayer is entitled to depletion where he has : (1) "acquired, by investment, any interest in the oil in place," and (2) secured by legal relationship "income derived from the extraction of the oil, to which he must look for a return of his capital." * * *

These two factors, usually considered together, constitute the requirements of "an economic interest." * * *

The second factor has been interpreted to mean that the taxpayer must look *solely* to the extraction of oil or gas for a return of his capital, and depletion has been denied where the payments were not dependent on production * * *

This Court has held that the second factor was present where a strip mining contractor was to receive a percentage of the sales price, *Helen C. Brown*, 22 T. C. 58 (1954) ; *James Ruston*, 19 T. C. 284 (1952) ; or where the contractor was to receive a designated price per ton delivered, which price could be altered as the market price fluctuated, *Denise Coal Co.*, 29 T. C. 528 (1957) ; *Walter Bernard McCall*, 27 T. C. 133 (1956) ; and *Virginia B. Coal Co.*, 25 T. C. 899 (1956).

The first factor, investment in the mineral in place, does not require title to the asset being depleted, but it does demand the existence of some right or capital investment in the mineral in place, the value of which is reduced as the mineral is extracted. *Burton-Sutton Oil Co.* v.

---

determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

\*     \*     \*     \*     \*     \*     \*

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND FOR CERTAIN OTHER MINES AND NATURAL MINERAL DEPOSITS.—

(A) In General.—The allowance for depletion under section 23 (m) in the case of the following mines and other natural deposits shall be—

\*     \*     \*     \*     \*     \*     \*

(ii) in the case of coal, asbestos, brucite, dolomite, magnesite, perlite, wollastonite, calcium carbonates, and magnesium carbonates, 10 per centum.

\*     \*     \*     \*     \*     \*     \*

[Subparagraph (A) is as further amended by section 319 (a), Revenue Act of 1951. Under section 319 (c), Revenue Act of 1951, as amended by section 5 of the Act of July 21, 1952, ch. 951, 66 Stat. 818 (82d Cong.), subparagraph (A) is effective on and after January 1, 1951.]

(B) Definition of Gross Income From Property.—As used in this paragraph the term "gross income from the property" means the gross income from mining. The term "mining" as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in. order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills. * * *

[Subparagraph (B) is as further amended by section 207, Revenue Act of 1950.]

*Commissioner*, 328 U. S. 25 (1946) ; *Kirby Petroleum Co.* v. *Commissioner*, 326 U. S. 599 (1946). The cost of the investment is unimportant and it makes no difference whether the return on the investment is in the form of mineral in kind or cash proceeds from the sale thereof. *Burton-Sutton Oil Co.* v. *Commissioner, supra.* "But the phrase 'economic interest' is not to be taken as embracing a mere economic advantage derived from production, through a contractual relation to the owner, by one who has no capital investment in the mineral deposit." *Helvering* v. *Bankline Oil Co.*, 303 U. S. 362 (1938). In *Walter Bernard McCall, supra,* we indicated that one of the most important criteria in determining whether an independent contractor possesses a true interest or only an economic advantage in the coal which he mines is whether or not he has an exclusive right to mine all of the coal within a given area. We found that exclusive right to exist where the stripper had agreed to mine all of the coal which could be economically mined on the property. *James Ruston, supra.*

The relationship between Perry and Hudson in the case before us here most resembles that present in *Usibelli* v. *Commissioner*, 229 F. 2d 539 (C. A. 9, 1955), affirming T. C. Memo. 1954-84. In that case a strip-mining contractor entered into a contract with the United States to mine coal in Alaska. The coal was to be delivered to the United States and the taxpayer was to receive a specified amount for each ton delivered. The contract required a minimum amount of coal to be delivered each month, but that amount could be altered by the United States which could also terminate the stripper's interest at will, or temporarily halt delivery. The contractor's right to receive the specified amount per ton could not be altered. The court there holding that the stripper did not have an economic interest in the coal stated that a contract terminable at will is indicative of a contract for services and not the vesting of an interest in the coal in place.

In the instant case, the contracts were terminable at the will of Hudson. Hudson could designate quantities of coal to be delivered or temporarily halt all deliveries. Perry did not have the right and did not agree to mine all of the coal on the properties but agreed to mine the coal only during the existence of the contracts. Neither did Perry become obligated to mine all of the coal. Perry never held title to the lands or the mines which it worked nor did it ever hold an interest in the lands. All of the coal mined by Perry belonged to Hudson. Perry did not sell coal to Hudson because it never owned the coal or any part of the coal it mined. Perry was required to deliver all the coal to Hudson. If Hudson did not want a delivery of coal, Perry was not permitted under the contracts to seek other buyers. Hudson, alone, was responsible for the sale of the coal. Hudson was obligated to pay Perry the agreed amount per ton delivered to it,

whether or not it was able to sell the coal. Payment to Perry was not dependent on the sale of the coal by Hudson. Once the coal was delivered to Hudson, Hudson was obligated to Perry to make the agreed payment. Perry agreed only to mine Hudson's coal, deliver it to Hudson, and receive, in return for its performance under the contracts, a set price per ton of coal. By terms of the contracts, Perry expressly agreed that it derived no economic interest thereunder in the coal and that Hudson would be entitled to all percentage depletion allowances. The contracts also expressly set forth that the agreed payments were intended as full compensation to Perry. The amounts designated by the various contracts to be paid Perry for mining and delivering the coal were not subject to market fluctuations. Only one set price was agreed to in each contract.

Petitioners argue that their situation is factually similar to *Commissioner* v. *Mammoth Coal Co.*, 229 F. 2d 535 (C. A. 3, 1955), reversing 22 T. C. 571 (1954) ; certiorari denied 352 U. S. 824; *Weirton Ice & Coal Supply Co.* v. *Commissioner*, 231 F. 2d 531 (C. A. 4, 1956), reversing 24 T. C. 374 (1955) ; *Commissioner* v. *Hamill Coal Corp.*, 239 F. 2d 347 (C. A. 4, 1956), reversing T. C. Memo. 1955–68, and that it is indistinguishable from *Virginia B. Coal Co.*, *supra*, and *Walter Bernard McCall*, *supra*.

While we have not adopted the positions of the Courts of Appeals in the above reversals, we do think the cited cases are factually distinguishable from the instant case. In *Mammoth Coal Co.*, *supra*, the arrangement between the stripper and the lessor gave the stripper the right to mine indefinitely and, if the lessor did not accept the coal, the stripper could then sell it to an outsider. In the instant case the contract is terminable at will, and all coal was to be delivered to Hudson with no provision for sale to an outsider if Hudson refused the coal. In *Weirton Ice & Coal Supply Co.*, *supra*, the strip miner owned the land and had agreed to sell all of the coal to the other party, but, because of the war situation, title in the land was passed to the purchaser and the stripper took a lease back. Title was to revert to the stripper after the mining was completed. The petitioners in this case have no such ownership in the property. The Court of Appeals in *Weirton Ice & Coal Supply Co.*, *supra*, emphasized the fact that the stripper had made the original investment in purchasing the property. The stripper in *Commissioner* v. *Hamill Coal Corp.*, *supra*, was to receive a specified amount for the coal delivered to the lessor. The amount to be received was constant but whether the stripper would deliver any coal to the lessor depended on whether the lessor sold the coal. In the case before us, Hudson could delay deliveries of the coal but Perry was not obligated to mine all of the coal to a designated depth. The Court of Appeals indicated that the stripper in *Commissioner* v. *Hamill Coal Corp.*, *supra*, was obligated to mine all of the

coal to a certain depth. As was indicated above, the strippers in *Virginia B. Coal Co., supra,* and *Walter Bernard McCall, supra,* were to receive a designated price per ton of coal delivered, but that price was subject to the fluctuations of the market.

The petitioners allege that as the market price fluctuated, new arrangements were made with Hudson to alter the amount to be received by Perry for the coal delivered to Hudson. However, no evidence of such an arrangement was submitted. Furthermore, any new arrangement could result only by mutual consent and not by Hudson alone. Such a new arrangement would constitute a new contract. In the cases mentioned above, *Virginia B. Coal Co., supra,* and *Walter Bernard McCall, supra,* the changes in amounts received by the stripper were not mutually agreed to but resulted from action solely by the lessor.

The Perry Construction Company entered into a contractual arrangement with Hudson for its services. *Usibelli v. Commissioner, supra.* This arrangement gave Perry a mere economic advantage to be derived from production through a contractual relation to the owner and is not an economic interest in the coal in place. *Helvering v. Bankline Oil Co., supra.*

The principles set forth above proceed from a recognition of the fact that the depletion allowance is designed to avoid the imposition of tax on what is essentially a return of the capital represented by the taxpayer's interest in the minerals in place. Both depletion and depreciation are predicated on this same basic premise of avoiding a tax on capital. See *United States v. Ludey,* 274 U. S. 295, 303 (1927), where the Supreme Court commented: "In essence, the deduction for depletion does not differ from the deduction for depreciation." In the instant case, there is no return of capital to which an allowance for depletion would be appropriate. True, petitioners had an investment in buildings, roads, and equipment. However, all of these assets were subject to an allowance for depreciation, and it is to depreciation deductions that petitioners must look for the recovery of their capital investment. To hold otherwise under the circumstances of this case where the taxpayers have no investment in the minerals in place, we would have to assume that Congress intended the depletion allowance to be a purely gratuitous benefit, over and above a reasonable allowance for depreciation, available to any taxpayer who has some "connection" with mineral extraction and without regard to whether the taxpayer has an investment in the minerals in question.

*Issue 2. Deductibility of a Loss on Assignment.*

Respondent disallowed the loss on assignment claimed by petitioners because he determined that the debt owing from the school was gratui-

tously canceled when Perry accepted a claim then pending before the Veterans' Tuition Appeals Board in cancellation of the indebtedness, such claim being without value at that time. Petitioners assert that the claim was worth at least $19,318.21 at the date of the assignment and base that assertion upon the following facts:

1. It was determined by Nathan Fink and Jacob Shiffman that it would cost $140 per student per month to operate the school.

2. The Veterans' Administration had paid them only $46.85 per student for each month of operation.

3. The school had an appeal pending before the Veterans' Tuition Appeals Board for the balance of the $140 needed to operate the school.

4. The partnership agreed with the school that the claim pending before the Veterans' Tuition Appeals Board was worth the additional $100 per student per month when it accepted the claim in cancellation of the indebtedness in the amount of $19,318.21.

We do not agree with the petitioners. We have found that the claim was worthless on the day of the assignment and point to some of the important facts. There is no evidence that it was the policy of the Veterans' Administration to pay the entire cost of operating schools. The Veterans' Administration had never agreed to bear the entire cost of operating this school. They had signed a contract whereby payments of $46.85 per student per month would be made, and no more. The value of any appeal claim depended upon the right of the school to expect the entire cost would be borne by the Veterans' Administration. There is no evidence to the effect that the Veterans' Administration would. There appears no evidence which would indicate that the appeal claim would ever bear fruit. In the absence of evidence establishing some legal right in the school to recover the entire cost from the Veterans' Administration, there would be no valid claim against the Veterans' Administration. The existing claim pending before the Veterans' Tuition Appeals Board was worthless. *Russell Box Co.* v. *Commissioner*, 208 F. 2d 452 (C. A. 1, 1953) ; affirming a Memorandum Opinion of this Court dated January 29, 1953. The assignment of the claim was effected by Nathan Fink as partner of the school and transferred to Perry, Nathan Fink also acting on behalf of Perry. Nathan Fink possessed no knowledge which would indicate that the claim had any value at the date of the assignment. Perry knowingly accepted a worthless claim in cancellation of an indebtedness. That claim cannot be the basis for a loss at some later date since it was worthless when received. *Raymond R. Bill & Co.*, 15 B. T. A. 320 (1929). Nor can the cancellation of the indebtedness on the assignment effect a deduction. Both Nathan Fink and Alex Fink, partners to the extent of the losses suffered by the school, had sufficient assets of their own at the time of the cancellation to satisfy

the debt owing to Perry. The claim outstanding against the school was not worthless when canceled and, therefore, the cancellation does not give rise to a worthless debt. *Earl V. Perry*, 22 T. C. 968 (1954). The loss on assignment is not deductible to Perry as a bad debt within the purview of section 23 (k) of the 1939 Internal Revenue Code.[2]

### Issue 3. Date of Upset of the Link Belt Shovel.

Respondent determined that the upset of the Link Belt shovel occurred on or about May 10, 1950, and reduced the basis of the shovel for depreciation purposes by the amount of insurance proceeds received because of the damage to the shovel as of the first of that fiscal year May 1, 1950. Petitioner introduced evidence at the trial that the upset occurred on August 24, 1950. Respondent did not contradict this evidence or offer any evidence to indicate that the upset occurred on any other date. Therefore, we have found as a fact that the upset of the Link Belt shovel occurred on August 24, 1950. The basis of the shovel for depreciation purposes should be adjusted as of that date.

*Decisions will be entered under Rule 50.*

---

[2] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
In computing net income there shall be allowed as deductions:

(k) BAD DEBTS.—
(1) General Rule.—Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. * * *