Emory W. PARSONS and Erma M. Parsons, Appellants,

v.

Francis R. SMITH, Former Collector of Internal Revenue for the First District of Pennsylvania.

Howard H. PARSONS and Martha Parsons, Appellants,

v.

Francis R. SMITH, Former Collector of Internal Revenue for the First District of Pennsylvania.

Lawrence H. PARSONS and Grace E. Parsons, Appellants,

v.

Francis R. SMITH, Former Collector of Internal Revenue for the First District of Pennsylvania.

Nos. 12299–12301.

United States Court of Appeals
Third Circuit.

Argued Dec. 19, 1958.

Decided March 27, 1958.

Rehearing Denied May 29, 1958.

Sherwin T. McDowell, Philadelphia, Pa. (William R. Spofford, Charles I. Thompson, Jr., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., on the brief), for appellants.

Marvin W. Weinstein, Washington, D. C. (Harold K. Wood, U. S. Atty., Alan J. Swotes, Asst. U. S. Atty., Philadelphia, Pa., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum,

**596**

Attys. Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

These are appeals by taxpayers, who are partners in a business, from a judgment of the district court denying their several claims for refunds of income taxes paid upon their respective distributable shares of certain partnership income derived from coal mining. The appellants can prevail only if the involvement of the partnership, hereinafter called Parsons, in a strip mining enterprise was such as to entitle the partners to deduct a depletion allowance, pursuant to Sections 23(m) and 114(b) of the Internal Revenue Code of 1939, 26 U.S.C. §§ 23(m), 114(b), as implemented by Treasury Regulation 111, § 29.23 (m)–1, 26 Code Fed.Reg., 1949 ed., § 29.23(m)–1, in computing partnership income from the mining operation. The problem presented is the often difficult, though familiar and recurring one of determining whether the person claiming a depletion allowance is "the owner of an economic interest in mineral deposits" within the meaning of Treasury Regulation 111, § 29.23(m)–1.[1]

■ The almost simultaneous recent decisions of this court in Commissioner of Internal Revenue v. Mammoth Coal Co., 1955, 229 F.2d 535, certiorari denied 352 U.S. 824, 77 S.Ct. 31, 1 L.Ed.2d 47, and of the Court of Appeals for the Ninth Circuit in Usibelli v. Commissioner of Internal Revenue, 1955, 229 F.2d 539, have gone so thoroughly into this tax problem as it arises in the context of

strip mining that we shall not elaborate again the basic concepts which are discussed in those cases. It is enough to repeat that the decisions make it clear that the economic interest in coal in place which will support a percentage depletion allowance for strip mining need not amount to an estate or tenancy as understood in the law of real property. Yet, it must be something more than an independent contractor's normal right to the benefit of his bargain and the kind of "interest" which that right always gives him in the subject matter of the contract. In characterizing an asserted interest a court will be guided by the total picture revealed by the facts of the case at hand.

On this appeal the facts found by the district court are unchallenged. The Parsons firm is a contractor and over the years has engaged in road building, strip mining and the drilling of gas wells. Parsons derived the income involved in this case from strip mining conducted on land owned by the Rockhill Coal Co.

In preliminary negotiations Rockhill had proposed that Parsons undertake extensive stripping of the area in question under a detailed written contract and, to that end, Rockhill actually drafted a proposed contract. But Parsons refused to sign the agreement stating that it did not wish to be bound to a long term performance because, if opportunity should arise, it wished to return to road building. Accordingly, it was agreed that the partnership would proceed with stripping in the designated area under a terminable oral agreement. The essential provisions of that oral contract are set out in the trial findings.

The agreement defined the area to be mined but left the partnership free to

1. " * * *
"Under such provisions [Secs. 23(m) and 114], the owner of an economic interest in mineral deposits or standing timber is allowed annual depletion deductions. * * * An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the

severance and sale of the mineral or timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because, through a contractual relation to the owner, he possesses a mere economic advantage derived from production." 26 Code Fed.Reg., 1949 ed., § 29.23(m)–1.

work as it chose. The partnership understood that it was not obligated to mine the tract to exhaustion. Indeed, although operations under the oral agreement were conducted from time to time over an eight year period, the tract still contained much strippable coal when Parsons terminated its operations. Some of this coal was later mined by another contractor. Moreover, it was mutually understood from the beginning, in the light of the already mentioned desire of the partnership to be free to change from stripping to road building on short notice, that either party could terminate the oral agreement on ten days notice. In this connection it was understood that after notice of termination by the landowner the partnership would still be privileged to remove and the landowner obligated to accept usable coal from which the partnership had actually removed the overburden—this constituting the major part of the stripping operation —before the notice was received.

It was agreed that the partnership should deliver the coal it mined to Rockhill's railroad cars and to no one else. In practice any coal which Rockhill rejected as unsuitable for its purposes was left in the pits as unsaleable. The parties agreed in advance upon a stipulated price per ton which Rockhill was to pay Parsons for usable coal. This price was not geared to and did not vary with the market price of coal. However, the price could be and on occasion was altered to reflect increased costs of production.

Parsons made a considerable investment in movable equipment used in the Rockhill stripping operation. Early in the taxable period the partnership committed to this job its own equipment valued at some $210,000. At the same time it was using about $130,000 worth of Rockhill equipment under a rental agreement with the landowner. As the work progressed the partnership rented an increasing amount of Rockhill equipment and used less of its own. There is no indication that the partnership equipment had utility only for this job or was specially adapted to it.

We are satisfied that what the parties agreed and what they did disclose the partnership acting only as an ordinary independent contractor in mining the Rockhill tract. First, the matter of compensation was handled as in an ordinary contract job. The partnership had no freedom to sell or dispose of the coal to its own account. It was entitled only to an agreed price from the owner of the mining property. And since that price did not fluctuate with the market, there is nothing about the scheme of payment to indicate any interest of the contractor in the mineral. If we ask how this arrangement for payment to the partnership for its work differed from the normal payment to an independent contractor for accomplishing an agreed result, it is immediately apparent that there is no significant difference.

The other important factor on this record is the agreed duration of the enterprise. Here it is noteworthy that the partnership did not enter the job with any understanding that it would mine the tract to exhaustion, and that it did not in fact do so. Rather, it was concerned from the beginning to remain free to discontinue stripping at any time. The terminability of the agreement on short notice was an essential and significant part of the bargain, not a mere formality inserted by some cautious draftsman. The logical conclusion from all of this is that the partnership contemplated and bargained for no economic interest in the mineral it agreed to extract beyond the independent contractor's normal concern with any subject matter with which he is to work for an agreed price. True, the ten day notice could not be used to deprive Parsons of compensation for work it already had done in removing the overburden from particular coal. But this special limited right to complete work already far advanced does not destroy the character of the contract as one deliberately made terminable on very short notice.

The cases support this view of the matter. While the courts characteristically look at the entire context in deciding

whether mining contractors have depletable interests in the mineral in place, the stripper usually bases his claim upon one or both of the factors discussed above. In some circumstances the stripper's right to mine the deposit to exhaustion, or even for a rather considerable period without particular reference to exhaustion, is stressed. See Commissioner of Internal Revenue v. Mammoth Coal Co., supra; Stilwell v. United States, 4 Cir., 1957, 250 F.2d 736; Winfield Mining & Contracting Co., 1954, 13 TCM 571; James Ruston, 1952, 19 T.C. 284; cf. G.C.M. 26290, 1950–1 Cum.Bull. 42. In others the fact that the stripper's income from the mining operation varies in accordance with the market price of the mineral makes his claim of depletable interest persuasive. See Commissioner of Internal Revenue v. Gregory Run Coal Co., 4 Cir., 1954, 212 F.2d 52, certiorari denied, 348 U.S. 828, 75 S.Ct. 47, 99 L.Ed. 653 (Vincent-Swaney contract); Virginia B. Coal Co., 1956, 25 T.C. 899; Paul E. Barry, Inc., 1955, 14 TCM 37; Winfield Mining & Contracting Co., supra; James Ruston, supra. But see C. A. Hughes & Co., 1955, 14 TCM 172. But unless some such special circumstance appears, differentiating the arrangement from the ordinary contract job, there is analytically no basis upon which the stripper, who has no conventional property in the mineral, can claim at depletable interest therein.

Appellants attach much significance to recent borderline cases in which the Court of Appeals for the Fourth Circuit has found that contractors engaged in strip mining on land of others were entitled to depletion allowances. See Stilwell v. United States, supra; Commissioner of Internal Revenue v. Gregory Run Coal Co., supra; Weirton Ice & Coal Supply Co. v. Commissioner of Internal Revenue, 4 Cir., 1956, 231 F.2d 531; Commissioner of Internal Revenue v. Hamill Coal Corp., 4 Cir., 1956, 239 F.2d 347. That court has certainly gone as far as any other in recognizing depletable interests in strippers. But in the cited Fourth Circuit decisions we find repeated emphasis upon the court's factual conclusion that the real understanding of the parties was that the strip miners would be allowed to exhaust the mineral, or at least to continue stripping operations for a very substantial time. Only in one of the arrangements considered in Commissioner of Internal Revenue v. Gregory Run Coal Co., supra, does this factor seem to have been absent. And there the owner and the strip miner had formalized their relationship in an agreement terming the strip mining project "this joint adventure." How much weight the court accorded this indication of the way the parties themselves viewed their relationship, we do not know. Perhaps no more can be said than that distinguishing facts usually prevent reasoning by analogy from being very helpful in borderline cases. In any event, we think the reasoning of the Fourth Circuit cases requires the stripper to marshal more significant indicia of interest in the mineral than the present record will yield.

One other point deserves separate mention. In these mining cases the allowance of a percentage depletion deduction from gross income for tax purposes is premised on the conception that a tax free recovery of capital actually invested in a wasting mineral deposit is fair. See Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 312, 76 S.Ct. 395, 100 L.Ed. 347. The commitment of capital as an investment in the exploitation of a given mineral deposit must be real and unequivocal. Otherwise, mining contractors, like contractors generally, must look to "receive their tax benefit through depreciation and obsolescence allowances, and not through an allowance for the depletion of the mineral deposit on which they happen to be working." See Usibelli v. Commissioner of Internal Revenue, supra, 229 F.2d at page 541.

Here the only thing set up as a capital investment in the Rockhill coal deposits is Parsons' purchase of a considerable quantity of movable equipment, accompanied by the rental of other equipment.

from Rockhill. There has been no showing that this equipment was specially adapted to this job or that it would not be suitable thereafter for such other undertakings as constituted the normal and familiar business of this contractor. Thus, quite apart from considerations relating to compensation and the terminability of the contract, it is very doubtful whether investment in equipment of general utility in a contractor's business is the type of capital expenditure which can properly be found to constitute an investment in a particular mineral deposit which the contractor has undertaken to work.

For these reasons we agree with the district court that the tax refund claims in suit are not well founded.

The judgment will be affirmed.

### Sur Petition for Rehearing

Before BIGGS, Chief Judge, and MARIS, GOODRICH, STALEY, KALODNER and HASTIE, Circuit Judges.

### PER CURIAM.

This petition for rehearing raises no point of substance that has not already been considered and decided against the petitioner. Accordingly, the petition is denied.

KALODNER, Circuit Judge (dissenting).

I am of the opinion that a rehearing should be granted, and the judgment of the district court reversed.

This result is required for the reasons I have given in my dissenting opinion in the Huss cases (Huss v. Smith, 3 Cir., 255 F.2d 601).

The taxpayers here, as in the Huss cases, were granted an exclusive right to remove all the merchantable coal in place in the reserved or leased area. They had a right of control over production of the mineral in place which gives rise to the economic interest necessary for the depletion allowance. Burton-Sutton Oil Co. v. Commissioner, 1946, 328 U.S. 25, 29, 32, 66 S.Ct. 861, 90 L.Ed.

1062. All the coal involved was produced during the existence of this interest. The fact that such interest might have been brought to an end some day in the future is not a relevant consideration.