255 F.2d 599
 George HUSS, Appellant,
v.
Francis R. SMITH, Collector of Internal Revenue, First District of Pennsylvania.
Russell HUSS, Appellant,
v.
Francis R. SMITH, Collector of Internal Revenue, First District of Pennsylvania.
Wesley HUSS, Appellant,
v.
Francis R. SMITH, Collector of Internal Revenue, First District of Pennsylvania.
 No. 12315.
 No. 12317.
 No. 12319.
 United States Court of Appeals Third Circuit.
 Argued December 19, 1958.
 Decided March 27, 1958.
 Rehearing Denied May 29, 1958.
 
 Leon H. Kline, Philadelphia, Pa. (Murray Milkman, Berger & Gelman, Philadelphia, Pa., on the brief), for appellants.
 Marvin W. Weinstein, Washington, D. C. (Harold K. Wood, U. S. Atty., Alan J. Swotes, Asst. U. S. Atty., Philadelphia, Pa., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellee.
 Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.
 HASTIE, Circuit Judge.
 
 
 1
 These appeals, like those we have decided today in Parsons v. Smith, 255 F.2d 595, challenge a district court ruling that a contracting firm which extracted coal from the land of another by strip mining was not entitled to claim a percentage depletion allowance in computing its income from that mining operation. Therefore, we will not repeat such of our discussion in Parsons v. Smith as presents legal conceptions common to all cases of this type. However, the controversies involve different arrangements between different parties concerning different tracts. And circumstances peculiar to a particular stripping arrangement may be decisive for or against the claimed depletion deduction. Therefore it is necessary to consider separately and in some detail the facts upon which the stripper relies in this case.
 
 
 2
 The present contractor, a partnership which we shall call Huss, entered into a written agreement with the Philadelphia and Reading Coal and Iron Co., hereinafter called Reading, concerning the strip mining of certain coal lands owned by Reading. For this work Huss was to be paid an agreed dollar amount per ton of usable ore it should extract and deliver to a colliery designated by Reading. The agreed price was described in the contract as "full compensation for the full performance of all work and for the furnishing of all material, labor, power, tools, machinery, implements and equipment required for the work". The provisions of this contract which relate to compensation are certainly no more favorable to the taxpayers' depletion claim than were the rather similar provisions in the Parsons case. In neither case does anything agreed or done about compensation suggest that the stripper acquired an interest in the mineral in place.
 
 
 3
 On the other hand the facts relating to the duration of the stripping agreement in this case are somewhat different from those in the Parsons case. Huss continued to mine the contract area until the parties mutually agreed that additional stripping would not be profitable. In this sense Huss did mine the deposit to exhaustion. However, the stripping contract expressly provided that Reading could cancel the agreement, terminating it unconditionally and without liability, on thirty days notice in writing. We are not told the reason for including this cancellation clause. We know only that it was part of the contract and that it was not invoked during the course of the mining operation under the contract.
 
 
 4
 In these circumstances there is more basis for argument here than there was in the Parsons case that the bargain contemplated such extensive mining of the area as would warrant characterization of the stripper's status as involving an interest in the mineral in place. Indeed, certain recent decisions of the Court of Appeals for the Fourth Circuit suggest the reasonableness of such an analysis on facts not very different from those here. See Commissioner of Internal Revenue v. Hamill Coal Corp., 4 Cir., 1956, 239 F.2d 347; Weirton Ice & Coal Supply Co. v. Commissioner of Internal Revenue, 4 Cir., 1956, 231 F.2d 531. But to us the most that can be said for the stripper's position on the present record is that reasonable men can differ on the inferences they draw from the facts and in the relative values they attribute to various facts in determining the category in which the total situation belongs. Indeed, this contract did not give the stripper the privilege of mining all uncovered coal after notice of termination, which in the Parsons case was thought to strengthen the stripper's claim to an interest in the mineral in place. Certainly a reasonable trial judge could view the absolute right of termination on thirty days notice as more significant than the fact that this privilege was not exercised in the given case. And this in substance is what the trial judge did. We cannot find reversible error in this evaluation of the evidence in relation to the rather vague standard the courts must administer in these cases.
 
 
 5
 Finally, we note that Huss invested a considerably larger sum than did the plaintiffs in the Parsons case in drilling and earth moving equipment. At one time Huss committed about $500,000 worth of equipment to this job. However, the district court found that, except for one item, all of this equipment had utility for stripping operations in general rather than special adaptation to this project. Nothing appears which distinguishes such expenditures from capital expenditures normally made by independent contractors who undertake large projects in such familiar fields as road building and general construction.
 
 
 6
 We are satisfied that the conclusion of the district court was consistent with the rational application of the legal standards stated in the statute and the implementing Treasury Regulations to the facts at hand. That is enough to require affirmance.
 
 
 7
 A separate issue is raised on this appeal with reference to so much of the judgment below as denied appellants any depletion allowance for strip mining prior to December 31, 1944 under certain other agreements called the "Stevens contracts". This ruling was explicitly based upon the trial court's conclusion that the taxpayers, who as plaintiffs below had the burden of proof, had failed to establish the existence prior to 1945 of such an agreement as would support a depletion allowance. We have examined the evidence on this branch of the case. It is not so clear and convincing as necessarily to persuade any reasonable trier of fact. We must, therefore, sustain the trial court's finding against the appellants on the facts.
 
 
 8
 The judgment will be affirmed.
 
 Sur Petition for Rehearing
 
 9
 Before BIGGS, Chief Judge, and MARIS, GOODRICH, KALODNER, STALEY and HASTIE, Circuit Judges.
 
 
 10
 PER CURIAM.
 
 
 11
 The petition for rehearing considered, we adhere to our view that the record affords adequate basis for the conclusion of the trial court that the stripper did not have a depletable interest in the mineral in place. It is strongly urged in the present petition that decisions of the Court of Appeals for the Fourth Circuit, cited and discussed in our opinion on this appeal, reach a contrary result on very similar facts. We are not sure what that Court of Appeals would do in reviewing a decision against the stripper on the facts of our case. But regardless of that, we are still persuaded that an affirmance is proper.
 
 
 12
 The petition will be denied.
 
 
 13
 KALODNER, Circuit Judge (dissenting).
 
 
 14
 I would grant the petition for rehearing. Further, on rehearing I would reverse the judgment of the district court on the principal issue involved — the existence of an economic interest.
 
 
 15
 The Supreme Court has charted the course and the law in cases of this type. Only recently it stated, firmly and concisely, that a taxpayer is entitled to the depletion deduction "where he has: (1) `acquired, by investment, any interest in the oil in place,' and (2) secured by legal relationship `income derived from the extraction of the oil, to which he must look for a return of his capital.'" Commissioner of Internal Revenue v. Southwest Exploration Co., 1956, 350 U.S. 308, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347.
 
 
 16
 "These two factors, usually considered together", said the Supreme Court in the Southwest Exploration case, "constitute the requirement of `an economic interest.'"
 
 
 17
 Nothing was said by the Supreme Court in that case on the score as to the impact of a right of termination of a contract creating an economic interest on the existence of that interest in the first place. Nor has the Supreme Court said so in any other case. We did not consider nor did we pass upon this question in Commissioner of Internal Revenue v. Mammoth Coal Co., 3 Cir., 1955, 229 F.2d 535. Nor has any other appellate court done so except the Fourth Circuit. That Circuit, however, has explicitly ruled that a right of termination does not destroy an economic interest which existed prior to its exercise. It did so in two cases: Weirton Ice and Coal Supply Co. v. Commissioner, 1956, 231 F.2d 531, 533 and Commissioner of Internal Revenue v. Hamill Coal Corp., 1956, 239 F.2d 347.
 
 
 18
 In Weirton it was said (231 F.2d at page 535):
 
 
 19
 "It is of no moment that the owner of the mineral, as in other cases in which the right of an extractor to a deduction for depletion has been upheld, had the option to terminate the arrangement at any time, for as the event proved, Weirton actually mined the coal during all the taxable years."
 
 
 20
 In Hamill, the contract (entered into in 1944) was to continue for one year and from year to year thereafter with the right of either party to terminate it at any time upon 90 days' written notice. The contract was terminated in 1947 by mutual agreement "after Daniel [the stripper] had removed substantially all the coal with an overburden of less than 40 feet." (239 F.2d at page 349.)
 
 
 21
 In Weirton the decision does not disclose when mining operation ceased or whether the stripper ever mined to exhaustion. In Hamill, however, the record discloses that subsequent to termination the owner of the mine actually mined some 90,000 tons of coal.
 
 
 22
 In the instant case it is undisputed that the stripper (taxpayers) mined to exhaustion and that the contracts were terminated by mutual agreement after such exhaustion so that the factual situation here is much stronger than in either Weirton or Hamill.
 
 
 23
 I agree with the view of the Fourth Circuit that the right of termination does not affect a stripper's right to depletion where the requisite economic interest as defined by the Supreme Court exists. The Commissioner and the courts must deal with a situation as it exists during the taxable year involved and not as it might exist in some future year because of the possible occurrence of an event through the exercise of a contractual right.
 
 
 24
 It is not necessary, however, that I go as far along the course stated in the decision of the instant case. The record here discloses that the termination clause was included in the contract as a precaution on the part of the owner to protect itself from possible difficulties with an incompetent stripper.[1] It may be noted parenthetically that in the opinion sought to be reconsidered it was erroneously stated "We are not told the reason for including this cancellation clause."
 
 
 25
 Assuredly, prior to the exercise of the termination clause, taxpayers here "had an economic interest in the oil [coal] in place through its [their] control over extraction." Burton-Sutton Oil Co., Inc., v. Commissioner, 1946, 328 U.S. 25, 34, 66 S.Ct. 861, 866, 90 L.Ed. 1062. That control, moreover, actually existed, as already said, until the property was mined to exhaustion. Further, as stated in Burton-Sutton Oil Co. "Depletion depends only upon production".
 
 
 26
 It is the possibility of profit from the use of rights over production dependent upon the extraction of the mineral which marks an economic interest. No money need be invested in the mineral deposit. Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. at page 312, 76 S.Ct. at page 397.
 
 
 27
 There is no room for doubt that the taxpayers had the requisite control over production, for under the contracts, the Coal Company gave to taxpayers the exclusive right to mine all of the merchantable coal in place in the leased area. That such right might have been brought to an end does not affect the present fact that the economic interest existed.
 
 
 28
 There is also no room for doubt that the taxpayers depended solely upon production for their return, since they received only the agreed price per ton for coal produced and delivered. Indeed, they bore all risks of mining, including, but not limited to, the finding and production of commercial quality coal in such quantities necessary to make operation profitable.
 
 
 29
 Until now, every appellate decision in this type of case, including our own decision in Commissioner of Internal Revenue v. Mammoth Coal Co., supra, has held that there is no requirement that the stripper must assume the risks of the ultimate market. To the extent that we now hold otherwise, we are in conflict with our decision in that case and with the decisions of the Fourth Circuit. We are also in conflict with the latest pronouncement of the Supreme Court, Commissioner of Internal Revenue v. Southwest Exploration Co., 350 U.S. at page 314, 76 S.Ct. at page 398, that the taxpayer must look solely to the extraction of the mineral for his return. That is what the taxpayers here had to do.
 
 
 30
 Although we said, in Commissioner of Internal Revenue v. Mammoth Coal Co., 229 F.2d at page 537, that "The facts in each case determine the result", I do not regard such declaration as an admission that the criteria to be applied are too vague to do so on other than the basis of "the reasonable man". To the facts must be applied statute and the specific rules pronounced by the Supreme Court in the interpretation of it. That is the teaching of Commissioner of Internal Revenue v. Southwest Exploration Co., supra.
 
 
 31
 I conclude, therefore, that the taxpayers during the taxable years involved had the requisite economic interest in the coal in place. This, to me, is the result required by the decisions of the Supreme Court, the Fourth Circuit, and this Court; and our present decision is inconsistent therewith.
 
 
 32
 Accordingly, I would grant rehearing and reverse the judgments of the district court.
 
 
 
 Notes:
 
 
 [1]
 Russell Huss testified (p. 60 N.T.) that the termination clause "was put in there in a form contract so as if they got hold of a contractor who was not reputable, who wouldn't live up to the contract, they could put him off the property without court action."